## SINCLAIR & VALENTINE COMPANY, Petitioner,

v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 76–1510.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1977.

Decided Feb. 24, 1977.

Alvin D. Shapiro, Kansas City, Mo., for petitioner; Stephen P. Dees, Kansas City, Mo., filed appendix and briefs.

Bert Bisgyer, Atty., N. L. R. B., Washington, D. C., for respondent; Bert Bisgyer, Jay E. Shanklin, Attys., John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief.

Before BRIGHT and HENLEY, Circuit Judges, and HARPER, Senior District Judge.*

BRIGHT, Circuit Judge.

Employer Sinclair & Valentine Co. discharged two production employees, Daniel Croy and Roy Oakes, for failure to report for work when available. The employees' Union [1] filed a charge with the National Labor Relations Board that the Employer had committed unfair labor practices in violation of § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3), contending that the real reason for these discharges rested on the employees' pro-union activities in an earlier attempt to organize the plant. The administrative law judge and the Board sustained the Union's contentions and granted an appropriate remedy to the employees of reinstatement and back pay, as well as issuing a cease and desist order. The employer petitions for review of that decision and the National Labor Relations Board cross-applies for enforcement of its order. We grant the petition for review and set aside the Board's order as one not supported by substantial evidence.

The Employer operates a small plant which produces printing inks at Dayton, Ohio, and employs ten production workers, including Croy and Oakes, plus two truck drivers. In October or November of 1974, the Union initiated an organization campaign. Included in its organizing committee were Croy and Oakes. The company received notice of the names of those on the committee in mid-November. The Union lost the election by a six-to-six tie vote on January 10, 1975. The incidents leading to the discharge of the employees occurred one week later.

Croy and Oakes, enroute to work in Croy's car, suffered a vehicle breakdown when the fan belt disintegrated. Croy then telephoned the employer's office manager, Ruth Bell, and informed her that his car was inoperable and that he would attempt to get to work if able to do so. In the same telephone call, Croy also spoke with a plant worker and arranged for that fellow employee to bring Croy's and Oakes' paychecks during the noon lunch break to Joe's Friendship Club, a bar located about six blocks from the plant. According to the testimony of Croy and Oakes, Croy arranged for his uncle to transport the two men to the bar. They arrived about noontime, picked up their checks, and then left the bar without reporting for work or further notifying the plant office of their decision not to work that day.

Ruth Bell notified John Martz, the Employer's manufacturing manager, of her telephone conversation with Croy. Martz pulled out Croy's and Oakes' time cards and learned that another employee had punched those employees in for work when, in fact, they had not appeared. Martz testified that he pulled the time cards as a preliminary step to interviewing Croy and Oakes on their return for the purpose of scheduling them to work overtime the next day, a Saturday. Martz also learned that Croy and Oakes had been to the bar, picked up their checks, and had not come to work.

Upon their return to the plant on the next working day, Monday, January 20, 1975, Martz and Patrick Turley, plant manager, called Croy and Oakes into the company office and discharged them.

Martz testified that the discharge rested on violation of plant rules relating to unauthorized absences from work. The posted plant rules, among other things, recited:

5. If an employee is unable to report to work due to illness or for any other acceptable reasons, he shall advise or call his supervisor or other person designated by management as soon as he knows he will be absent and at least sufficiently in advance of the start of his shift so that

---

* ROY W. HARPER, Senior District Judge, Eastern District of Missouri, sitting by designation.

1. Dayton Printing Pressmen, Assistants' and Offset Workers' Union No. 54, International Printing and Graphic Communications Union, AFL–CIO.

arrangements can be made to replace him.

\* \* \* \* \* \*

7. An employee must, at all times, be in fit physical condition to perform the work required of him. He shall not neglect his job or refuse to perform work assigned to him by his supervisor. He must be available and report for work as scheduled and perform his regular or overtime work as assigned to him in good workmanlike manner.

\* \* \* \* \* \*

16. Unauthorized or excessive absence or tardiness shall not be permitted.

Croy and Oakes testified that they felt that they had no obligation to return to work at noon because they understood that the Employer's leave policy permitted an employee to be absent for four days a year with pay without having to explain the absences to the Employer. The only requirement was that the employee notify the company as soon as the employee knew he was to be absent. The company representatives, on the other hand, testified to a sick leave policy, permitting employees four days off with pay per year for sickness or for good personal reasons approved in advance by management.

The administrative law judge recognized that if the leave policy was that as described by management, discharges could normally be expected. On the other hand, the discharges would be "obviously pretextual if the leave policy is that described by Croy and Oakes."

The administrative law judge determined that the stated justifications for the discharges were pretexts and that the real reason for the discharges was that these two men had acted as "foremost leaders" in the Union organization campaign, and that the Employer acted out of union animus. This "animus" determination rested upon the administrative law judge's finding that Charles Jackson, a former supervisor and foreman of the plant who, when asked to sign a union card by Oakes during the organizing campaign, told Oakes that he could not sign the card because he was a member of management, and that the company would close down the plant or do away with employee benefits if the plant was organized. The administrative law judge attributed such statements to the Employer even though Jackson was later demoted to the ranks.

These premises are too weak to support the inference that the Employer's reasons for discharge were pretextual and that union animus motivated the Employer's action against these employees.

All testimony indicated that it was the custom of employees to notify the Employer of an intention to be absent, whether for sickness or otherwise. This testimony is supported by the posted plant rules. Rule 5 is particularly important, which recites that the employee shall notify management as soon as he knows he will be absent. In this case the two employees reported that they would get to work if able to do so. Indeed, they got within six blocks of the plant, picked up their paychecks from a coworker, but flaunted the Employer's attendance rules in the presence of one or more other company employees then present in Joe's Friendship Club.

The record establishes that under somewhat similar circumstances in 1970, an employee had called in sick and then appeared at the plant at noon displaying a large fish that he had just caught. That incident produced a similar discharge.

The anti-union attitude of the company allegedly displayed through supervisor Charles Jackson rests on somewhat chimerical grounds. Although some testimony indicates that Charles Jackson may have been a supervisor at the time, other evidence discloses that the production employees induced Jackson to come to a union meeting in order to persuade him to change his mind about the union. Jackson in fact voted in the election. The administrative law judge in his opinion recognized that, generally speaking, the company's foremen occupied nonsupervisory positions akin to the position of lead men in other plants. The administrative law judge's opinion referred to

Charles Jackson at one point as having been assistant to the production superintendent until December of 1974, and at another point as having been a foreman prior to December of that year. To attribute Charles Jackson's personal opposition to the Union as indicating union animus by management strikes this court as rather farfetched under the circumstances.

In sum, the administrative law judge's determination that the discharges rested on pretextual grounds will not wash in light of the record as a whole—for as we have noted, the management did possess a good reason for discharging these employees and this discharge was consistent with a 1970 discharge of an employee made under somewhat similar circumstances. Moreover, the statement of Charles Jackson furnishes a very slender reed upon which to base any inference that the company exhibited union animosity and that such animosity carried over in its decision to terminate the employment of Croy and Oakes. *See Chemvet Laboratories, Inc. v. NLRB*, 497 F.2d 445, 451–52 (8th Cir. 1974).

The substantial evidence in this record indicates that the Employer possessed a proper reason to discharge these employees. On the other hand, the general counsel failed to prove either general or specific employer hostility to the Union. The Board's case to set aside these discharges seems grounded upon conjecture rather than substantial evidence. Accordingly, the Employer's discharge decision must stand. *See Chemvet Laboratories, Inc. v. NLRB*, 497 F.2d 445, 451–52 (8th Cir. 1974); *NLRB v. Speed Queen*, 469 F.2d 189, 193–94 (8th Cir. 1972); *Kellwood Co., Ottenheimer Bros. Mfg. Div. v. NLRB*, 411 F.2d 493, 497–98 (8th Cir. 1969); *D. C. International, Inc. v. NLRB*, 385 F.2d 215, 220–21 (8th Cir. 1967).