## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## DILLON STORES, Division Of Dillon Companies, Inc., Respondent.

### No. 79–1503.

United States Court of Appeals, Tenth Circuit.

Submitted Nov. 20, 1981.

Decided March 3, 1981.

---

Janet C. McCaa, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., with her on brief), for N. L. R. B.

William G. Haynes of Eidson, Lewis, Porter & Haynes, Topeka, Kan., for Dillon Stores, Division of Dillon Companies, Inc.

Before SETH, Chief Judge, McKAY, Circuit Judge, and CHRISTENSEN, Senior District Judge.*

CHRISTENSEN, District Judge.

The National Labor Relations Board seeks enforcement of its order issued against Dillon Stores, Division of Dillon Companies, Inc. (the Company), pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). The Board adopted the findings and order of the Administrative Law Judge (ALJ) who found that the Company had committed an unfair labor practice as defined in section 8(a)(1) and (3) of the N.L.R.A., 29 U.S.C. § 158(a)(1) and (3),[1] by changing the duties

of and then discharging James P. Kuhn because of his union activities.

Kuhn was employed by the Company from July, 1963, until his discharge on January 7, 1978. In April of 1977, he was transferred to the Company's store No. 50 where he worked in the meat department with Melvin Cowger, the department manager. On November 3, 1977, Kuhn's duties were changed from meatcutting to ordering, stocking cases, wrapping and cleaning. On January 7, 1978, without prior warning, Kuhn was discharged by the Company.

Contemporaneous with these events was an attempt to unionize the Company's meat market employees. In February and March a representation hearing was held, where the Board determined that the Company's meat market managers, including Cowger, were not supervisors within the meaning of section 2(11) of the Act and were thus eligible to vote in the Board-conducted elections. Both Cowger and Kuhn voted in the May 13, 1977 election and in a second election held on November 30, 1977.

In the unfair labor practice proceeding based on Kuhn's discharge, the ALJ allowed relitigation of Cowger's supervisory status and concluded that he was a statutory supervisor whose anti-union actions and statements were attributable to the Company. The ALJ further concluded that anti-union animus was the motive for Kuhn's change in duties and ultimate discharge.

The Company resists enforcement of the Board's order on the grounds that (1) relitigation of Cowger's supervisory status was error and (2) there is no substantial evidence on the record to support the findings that Cowger was a supervisor or that Kuhn's change in duties and discharge were in violation of section 8(a)(1) and (3).

....

---

* Of the United States District Court for the District of Utah, sitting by designation.

1. 29 U.S.C. § 158(a).

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

The Company contends that the Board's regulation 29 C.F.R. § 102.67(f) renders the earlier determination that Cowger was an employee *res judicata*, precluding relitigation of his status. The relitigation of Cowger's status with the conclusion that he was a supervisor was essential to the Board's determination that there was a discriminatory discharge, since it relied upon Cowger's statements to impute anti-union animus to the Company.[2]

Section 102.67(f) provides in part:

> The parties may, at any time, waive their right to request review. Failure to request review shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding.

■ This section bars relitigation of an issue determined in a representation hearing only when the subsequent hearing is a "related" proceeding. Most courts addressing the issue have concluded that unfair labor practice proceedings under section 8(a)(1) or (3) are not so related to prior representation hearings that relitigation of common issues is precluded. *E. g., Rock Hill Tel. Co. v. NLRB*, 605 F.2d 139 (4th Cir. 1979); *Heights Funeral Home, Inc. v. NLRB*, 385 F.2d 879 (5th Cir. 1967); and *Amalgamated Clothing Workers of America v. NLRB*, 365 F.2d 898 (D.C.Cir.1966). While the Board has not always been consistent in applying section 102.67(f), it has recently adopted the rationale of *Amalgamated Clothing Workers*. *See Serv-U-Stores, Inc.*, 234 NLRB No. 191, 1978 CCH NLRB ¶ 19.054 nn. 8 and 10 (1978) (expressly overruling decisions inconsistent with *Amalgamated Clothing Workers*).

We agree with this interpretation. The purpose of determining whether an individual is a supervisor is different in a represen-

tation proceeding than it is in an unfair labor practice proceeding involving interference with organizational rights, and different policy considerations underlie each. The rule has an additional advantage of avoiding the unnecessary delay in representation elections that would result if parties were forced to engage in protracted litigation to protect their interests in different contexts. *Amalgamated Clothing Workers*, 365 F.2d at 905.

The Company's remaining contentions challenge the ALJ's findings of fact, which must be judged by the substantial evidence standard enunciated in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This standard of review is a narrow one, requiring upholding of the Board's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." 340 U.S. at 477, 71 S.Ct. at 459. If such evidence exists in the record considered as a whole, the Board's findings must be accepted without any necessity of searching for contrary alternative inferences that might also be drawn from the record evidence. *U. S. Soil Conditioning v. NLRB*, 606 F.2d 940, 944 (10th Cir. 1979).

■ There is ample evidence on the record as a whole to sustain the Board's conclusion that Melvin Cowger was a supervisor within the meaning of section 2(11) of the N.L.R.A., 29 U.S.C. § 152(11), which provides:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with

---

**2.** Although a finding of supervisory status is not always necessary before imputing an individual's actions to an employer, *Betts Baking Co. v. NLRB*, 380 F.2d 199, 202 (10th Cir. 1967), this is the usual basis for such an imputation and was the theory upon which General Counsel relied. We note also that in some circumstances a supervisor's acts cannot be

imputed to the employer. *See Sinclair & Valentine Co. v. NLRB*, 549 F.2d 1183 (8th Cir. 1977). *See also Furr's, Inc. v. NLRB*, 381 F.2d 562 (10th Cir. 1967), *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967). In this case the circumstances do not justify a departure from the general rule.

the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Since this section is framed in the disjunctive, the existence of any one of the powers listed, as long as it involves the use of independent judgment, is sufficient to support a determination of supervisory status. *Furr's, Inc. v. NLRB*, 381 F.2d 562, 565 (10th Cir. 1967), *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967).

■ The Board found that Cowger was the manager of a meat department staffed by four to five people and that he assigned and scheduled work, oversaw the employees in the performance of their work, granted time off, and assigned overtime and vacations. Cowger's immediate superior, the district supervisor, visited the market approximately once a week for a period of 45 minutes to one hour. At all other times Cowger directed the daily operation of the department. In addition, Cowger made regular written evaluations of the employees' performance, which sometimes took the form of recommendations for promotion. These recommendations were honored in most instances.

These findings and the resulting conclusion that Cowger was a supervisor are supported by substantial evidence in the record. A contrary determination would lead to the conclusion that, except for the one-hour weekly visits by the district supervisor, the meat market employees functioned without any in-house supervision. The unlikelihood in general of such a situation and the contrary indications in the record before us confirm the Board's conclusion. *See, e. g., Vega v. NLRB*, 341 F.2d 576 (1st Cir. 1965), *cert. denied*, 382 U.S. 862, 86 S.Ct. 123, 15 L.Ed.2d 100 (1965).

Now as to the Board's findings that Kuhn's duties were changed and he was discharged because of his union activities: The credited evidence reasonably tends to establish and the ALJ found the following facts: Prior to his discharge, Kuhn worked for the company fourteen and a half years with an unblemished work record. During the last ten years of his employment he usually worked as a "second man" in the Company's meat departments. He first learned of the organizational campaign of the Amalgamated Meat Cutters and Butcher Workmen of North America, Local 576 in March of 1977 through conversations with other meat department employees. In one of these conversations he urged another employee to attend a union meeting in order to find out about its program.

■ In April of 1977, Kuhn was transferred to store No. 50 to work under the direction of Melvin Cowger. At about this same time he signed a union authorization card at his home. During his first several months at store No. 50, Kuhn received numerous compliments from Cowger regarding his performance. On May 3, Kuhn voted in the representation election. A month later he informed Cowger that he had received a subpoena requiring his attendance at a post-election hearing. Cowger laughed and responded, "You got a subpoena. You're in trouble. You better get a lawyer." At lunch that day Cowger made the unsupported statement to other employees that Kuhn had received the subpoena because he was responsible for the pregnancy of a thirteen-year old girl. Four days later, Cowger offered Kuhn five dollars not to honor the subpoena. He repeated the offer several times and thereafter raised the offer to ten dollars. Kuhn attended the representation hearing but did not testify, apparently because his testimony was unnecessary. Some or all of the other employees appearing at the hearing testified on behalf of the union.

During the ensuing months, Cowger's attitude toward Kuhn changed. He began "cursing and ridiculing" him daily. On November 3, Cowger informed Kuhn that his duties would be changed from meatcutting to ordering, stocking cases, wrapping and cleaning. Because of this change in assignment, Kuhn was required to work until 6:00 p.m. on Saturdays instead of his former 4:30 p.m. quitting time. Later that month Kuhn asked to take his annual "floating holiday" around Thanksgiving. Cowger ar-

bitrarily refused the request. On November 30, Kuhn voted in the second representation hearing.

On December 3, after arranging the temporary transfer of another employee to the store, Cowger told Kuhn, "Your brother is coming over." When Kuhn said he didn't have a brother, Cowger responded, "Bob Puff, your union brother." Later that day Cowger referred to another employee as Kuhn's "union brother." One month later Kuhn was summarily fired without prior warning.

The Company's defense to the charge that it changed Kuhn's duties and discharged him because of union activities was that Kuhn's work performance was inadequate. Even though Kuhn's employee evaluations were high prior to his transfer to store No. 50, Whitie Miller, the district supervisor, testified that at store No. 50 Kuhn could not get along with other employees and his presence had a negative effect on morale and production. The Company did not introduce evidence of any decreased production or other objective evidence of inferior performance by Kuhn. It did present testimony that one employee had asked for a transfer to "get away from the hassle" between Cowger and Kuhn. However, the ALJ pointed to evidence of numerous employee complaints about Cowger in refusing to give weight to this evidence, concluding that the assertion of poor work performance was vague and unsupported by concrete evidence.

■ Underlying much of the Company's challenge to the Board's findings is an attack on the ALJ's credibility determinations. It argues that the ALJ acted arbitrarily in uniformly crediting the Board's witnesses and discrediting its witnesses. Merely because the ALJ believed the employee's story does not furnish reason to overturn his credibility determinations. *NLRB v. Pepsi-Cola Bottling Co. of Topeka*, 613 F.2d 267, 271 (10th Cir. 1980). The ALJ advanced good reasons for his appraisal of credibility, and it is not for this court to substitute its weighing of credibility for that of the ALJ absent extraordinary cir-

cumstances. *Osteopathic Hospital Founders Ass'n v. NLRB*, 618 F.2d 633 (10th Cir. 1980).

■ In establishing that an employee's duties were changed and he was discharged in violation of section 8(a)(1) and (3), the Board bears the burden of proving that these actions were unlawfully motivated, and this burden must be met by substantial evidence. *NLRB v. First Nat. Bank of Pueblo*, 623 F.2d 686, 693 (10th Cir. 1980). Proof of an employer's knowledge of his employee's union activity is an essential part of that burden. *Bill's Coal Co., Inc. v. NLRB*, 493 F.2d 243, 246–47 (10th Cir. 1974). There is no direct evidence in the record that Cowger or any other company representative knew that Kuhn signed a union authorization card or that he had urged another employee to attend a union meeting. Of course, an employer's knowledge that an employee voted in representation elections and honored a subpoena to appear at a representation hearing, in and of itself would be insufficient to establish knowledge of union support. However, such knowledge may be established by circumstantial evidence. *Id.* at 247. Cowger's singling out Kuhn for derision regarding his subpoena, his extraordinary interest in inducing Kuhn not to honor it, and his multiple references to Kuhn's "union brothers," as well as the small size of the market in which the two worked are circumstances from which a reasonable inference of knowledge of union support may be drawn.

■ In assessing whether the record reasonably supports the finding of discriminatory change of duties and discharge, we are mindful that an employer may dismiss an employee for any reason or no reason at all, so long as hostility toward the employee's union activities does not enter into the decision. *Betts Baking Co. v. NLRB*, 380 F.2d 199, 203 (10th Cir. 1967). But when the Board produces evidence raising a reasonable inference of unlawful motive, the employer must explain its actions consistent with a legitimate motivation. *NLRB v. Okla-Inn*, 488 F.2d 498, 506 (10th Cir. 1973). Determining the degree of significance to

be accorded the employer's explanation is, within the bounds of reason, the primary responsibility of the Board. Against a prima facie showing of unlawful motivation, a flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation. *See Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966). *See also NLRB v. Automotive Controls Corp.*, 406 F.2d 221 (10th Cir. 1969) and *NLRB v. Okla-Inn*, 488 F.2d at 507. The Board's finding of an improper motive for Kuhn's change of duties and discharge is buttressed by the Company's vague and unsupported explanation for its actions.

There are circumstances in the record that could support the Board if it had arrived at a contrary decision.[3] But it did not do so, and we may not substitute our judgment for that of the Board if its crucial findings have a reasonable basis in the record considered as a whole. In our opinion they have.

The Board's application for enforcement of its order is granted.

---

**3.** The Company argues that the circumstances of Kuhn's change in duties and discharge make it unreasonable to infer an anti-union animus for Kuhn's treatment. It emphasizes that a long period of time elapsed between any knowledge it might have had of Kuhn's union activities and his change in duties and discharge and that other employees, who were not harassed or discharged, were as active or more active in support of the union than Kuhn was. In other circumstances the timing of an employee's discharge and the limited nature of his union activities have contributed to the court's conclusion that an inference of unlawful motive could not be drawn. *E. g., NLRB v. First Nat.*

*Bank of Pueblo*, 623 F.2d 686 (10th Cir. 1980). The circumstances of this case, however, do not require such a conclusion. Cowger's anti-union statements and actions were directed specifically at Kuhn and his union activities, suggesting that this particular employee was singled out for abuse in at least significant part because of his union activities. Since this harassment originated during, and continued throughout, the unionization period, the lapse in time between the Company's knowledge of his union activities and his change in duties and discharge does not negate the inference of anti-union motivation.