FILED
United States Court of Appeals
Tenth Circuit

June 10, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LEISER CONSTRUCTION, LLC,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

No. 07-9519

---

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

LEISER CONSTRUCTION, LLC,

Respondent.

No. 07-9525

-----------------------

IRON WORKERS LOCAL UNION NO. 10, AFFILIATED WITH INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL AND REINFORCING IRON WORKERS, AFL-CIO,

Intervenor.

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE, GORSUCH**, Circuit Judges, and **PARKER**, Senior District Judge.[**]

---

Leiser Construction, LLC ("Leiser") petitions for review of the final Decision and Order of the National Labor Relations Board entered on February 28, 2007 and corrected on March 5, 2007 ("Decision and Order"). *See Leiser Construction LLC and Iron Workers Local Union No. 10, a/w International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, AFL-CIO*, Case 17-CA-23177. The National Labor Relations Board ("Board"), in turn, cross-petitions for enforcement of the Decision and Order. The Iron Workers Local Union No. 10, affiliated with International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, AFL-CIO ("Union") was the charging party in the case below and is an intervenor in the proceeding before us. The National Labor Relations Act ("NLRA"), 29 U.S.C. §160(e)-(f), provides us with the jurisdiction to review, modify, and enforce Board orders. We deny Leiser's petition for review and grant the Board's cross-petition for enforcement of its Decision and Order.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**]The Honorable James A. Parker, Senior District Judge, United States District Court for the District of New Mexico, sitting by designation.

## I. BACKGROUND

### A. Facts

Leiser is a nonunion company that performs structural steel erection work in the construction of commercial buildings. Leiser is located in Madison, Kansas and is owned by Lloyd Leiser and his wife, Sandra Leiser. Mr. Leiser is the general manager who also works in the field with crews. Ms. Leiser is the office manager.

This case arises out of NLRA unfair labor practice charges filed by the Union against Leiser for discrimination based on Union affiliation and activity. The events at issue concern (1) Leiser's discharge of David Coleman ("Coleman"); (2) Leiser's alleged threats of physical violence and retaliation against Travis Williams ("Williams"); (3) Leiser's alleged suspension of Williams; and (4) Leiser's refusal to hire Richard Christopherson ("Christopherson") and Michael Bright ("Bright").

#### 1. *Coleman*

In December 2004, Union organizer Coleman applied for a welder job with Leiser. Mr. Leiser told Coleman when he picked up the job application form that Leiser was not a union company. Even so, Coleman filled out the job application form but did not list his Union affiliation or any prior union employment. Instead, Coleman fabricated two employers because he felt that Leiser would not employ him if Leiser knew he had worked for union companies. Coleman, nonetheless, had 12 more years of work experience than what he revealed on the job application form.

Mr. Leiser subsequently hired Coleman at the end of December 2004 without checking Coleman's references. During the first day of work at Leiser, Coleman heard another employee, Steve White, state that Mr. Leiser "hates the Unions." Transcript of Hearing before Administrative Law Judge ("Tr.") at 65, dated Jan. 31, 2006. Coleman's work performance at Leiser, however, was good and Mr. Leiser apparently liked Coleman.

Coleman later asked Christopherson, a Union organizer and assistant business agent for the Union, to speak to Mr. Leiser about Leiser signing on with the Union. On January 11, 2005, Christopherson approached Mr. Leiser at a job site about Leiser becoming a Union company. Mr. Leiser refused to sign on with the Union stating that he had a bad experience with union workers in Detroit, Michigan. Mr. Leiser also refused Christopherson's request to speak to Leiser employees about the Union. Later at lunch that day, Mr. Leiser told some employees about Christopherson's visit and noted that union business agents use union dues to "ride around on their fat asses in their new trucks." Tr. 67.

On January 20, 2005, Coleman went to work as usual and then to lunch with Mr. Leiser and other Leiser employees. Coleman secretly tape recorded the conversations at lunch and began handing out Union cards. Coleman admitted to Mr. Leiser that he is an "organizer man" and asked Mr. Leiser if he was fired. Vol. I, General Counsel's Exhibit ("GCX") 12 at 13. Mr. Leiser responded: "Yep, enjoy, good while it lasted." *Id*. When Coleman went back to the job site to pick up his tools and return Mr. Leiser's hard hat,

Mr. Leiser confirmed that Coleman had been fired. Mr. Leiser further complained about the Union not leaving him alone and the poor quality of union workers. Mr. Leiser was also disappointed that Coleman had lied to him regarding Coleman's Union affiliation. Coleman then asked Mr. Leiser whether he would have hired him if Mr. Leiser had known Coleman was a Union iron worker. Mr. Leiser replied, "No." *Id*. at 19.

Mr. Leiser contends that on April 12, 2005, he offered to rehire Coleman but Coleman refused the job offer. Coleman, however, denies that Mr. Leiser made a rehire offer.

2. *Williams*

In February 2005, Williams, a member of the Union, asked Tracy Thompson, an employee in the Leiser office, to send him a job application form. Williams did not disclose to Ms. Thompson that he was a Union member. After receiving the job application form a couple of days later, Williams spoke to Coleman about working for Leiser. As a result of that conversation, Williams decided not to reveal his Union membership in the job application form. Williams's job application form, therefore, omitted prior union jobs and his Union apprenticeship.

In March 2005, Williams interviewed with Mr. Leiser. Williams secretly tape recorded the interview in which Mr. Leiser asked Williams if he was associated with any unions. Williams answered that he was not associated with a union. Mr. Leiser then hired Williams.

On the morning of April 11, 2005, Williams worked at the Scott City, Kansas job site (400 miles from Williams's home in DeSoto, Kansas) with fellow Leiser employees Brian Muting ("Muting") and Dan Williams. At lunch, Williams put on his own personal hard hat which had Union stickers on it and wore a Union tee shirt with a vulgar and obscene depiction. Williams approached Muting and told Muting that he was a member of the Union and he was there to organize Leiser. Williams offered both Muting and Dan Williams Union cards. Both Muting and Dan Williams refused to accept the cards. Williams then went to his car and put on his Leiser hard hat and regular work tee shirt. Muting stopped Williams from returning to work stating that "Lloyd is probably going to do to you what he did to the last person." Tr. 120. Muting immediately called Mr. Leiser and told him that Williams was a Union worker. Mr. Leiser instructed Muting to tell Williams to return to Kansas City (350 miles from Scott City)[4] and go to a job site there the next morning at 7:00 a.m. Mr. Leiser told Williams on the phone the following: "You weasled your way in, didn't you? . . . . That's all right. I know how to take care of people like you. You just be on my job at 7 o'clock in the morning and don't worry about what you'll be doing. You'll do what I tell you. You've got 15 minutes to get off that job." Tr. 121. Mr. Leiser admitted that he was probably angry and yelling at Williams.

Williams subsequently asked Coleman to go with him to the Kansas City job site

---

[4] There is confusion in the record about the location of DeSoto. DeSoto is actually closer to Scott City than the record reflects, because DeSoto is located between Scott City and Kansas City.

because Williams was scared and thought there might be a fight. The next morning, April 12, 2005, at 6:30 a.m. Coleman and Williams met across the street from the Kansas City job site. Williams brought his Union hard hat and work tools. At about 7:00 a.m., Mr. Leiser arrived at the job site. Williams approached Mr. Leiser and offered him a Union card. Mr. Leiser refused the card. Williams then proceeded to tell the gathering employees that he was there to help organize Leiser and offered the employees Union cards. After making that announcement, Williams told Mr. Leiser that he was ready to go to work. Mr. Leiser, however, stopped Williams and explained that he asked Williams to leave the Scott City job site because Mr. Leiser did not want Williams talking to Leiser employees about the Union. In addition, Mr. Leiser said that there was an employee at the Scott City job site who probably would have killed Williams for being a union member. Next, Mr. Leiser stated to Williams that he would not work with Williams if he wore his Union hard hat and that Williams had to either get another hard hat or take the Union stickers off. Williams did not comply with Mr. Leiser's request regarding the Union hard hat. Shortly thereafter, Williams declared he was on strike and left the job site.

3. *Christopherson and Bright*

On February 1, 2005, Christopherson called Leiser's office from Coleman's office about a January 30, 2005 job advertisement for iron workers and about getting job application forms for himself and Bright, another Union organizer. Christopherson spoke with Ms. Leiser and tape recorded that conversation. When Ms. Leiser asked why Christopherson and Bright were not in the Union, Christopherson replied that actually he

was a Union organizer and he asked if that would make a difference in applying for a job with Leiser. Ms. Leiser stated, “Oh, well sure it would.” GCX 4 at 2. Christopherson then asked, “Oh, you’re not gonna hire a union organizer?” *Id*. Ms. Leiser responded by laughing and stating that she would send the job application forms to Christopherson.

Not having received any job application forms from Leiser in three weeks, Christopherson again called the Leiser office on February 21, 2005 and spoke with Ms. Thompson about mailing him job application forms.[2] Ms. Thompson noted that the positions Christopherson and Bright were interested in applying for had not been filled and that Leiser was still hiring. Christopherson mentioned to Ms. Thompson that he and Bright were Union organizers. Christopherson received the job application forms from Leiser two or three days later. Ms. Leiser, in turn, received Christopherson and Bright’s completed job applications after February 24 or 25, 2005.

Christopherson’s job application form indicates that he is a certified welder; that he completed a three year iron worker apprenticeship; and that he has 24 years of experience in structural steel and precase. Bright’s job application form shows that he is a certified welder, connector, rigger, foreman, precast erector, and sheeter; that he graduated from a three year apprenticeship program; and that he has 28 years of iron worker experience. Both Christopherson and Bright indicated on their job application

[2]Other job applicants, including Williams and Steve Miller (“Miller”), who did not mention the Union when requesting job application forms received the forms from Leiser within a couple of days.

forms that they were currently employed as Union organizers and had been since 1995. In fact, Christopherson and Bright did not disclose any field experience since 1995.

Near the time Ms. Leiser received Christopherson and Bright's job applications at the end of February 2005, Leiser hired Todd Skinner, David Bryd and Doug Foster to fill the job openings for which Christopherson and Bright had applied. However, Doug Foster ("Foster") never showed up for work as scheduled on March 1 or 2, 2005. As a result of this immediate vacancy, Ms. Leiser hired Jeff Barnum ("Barnum"), a certified welder, to replace Foster. Ms. Leiser stated that she hired Barnum because she had spoken with him on February 25, 2005 when she had returned his telephone call about sending him a job application form. Barnum's job application form was dated March 1, 2005, but he did not start working for Leiser until April 4, 2005.

According to Ms. Leiser, if there is no longer a need to hire an employee, job applications are simply filed away. When additional employees are needed, Ms. Leiser may look at job applications filed 30 to 60 days previously. Ms. Leiser does not recall looking at Christopherson and Bright's job application forms. However, during this period Ms. Leiser missed approximately two weeks of work beginning about March 7, 2005 due to a miscarriage and was distracted because of personal reasons.

Between February 27 and December 21, 2005, Leiser hired approximately 13 employees. Leiser never interviewed, let alone hired, either Christopherson or Bright during this period.

4. *Other Union Applicants and Employees*

It is undisputed that Leiser has interviewed, hired, and employed persons affiliated with unions. In June 2005 Leiser offered jobs to five Union workers who Coleman had introduced to Mr. Leiser. None of these workers accepted the job offers. In addition, Miller, a Union witness, acknowledged that a Leiser employee who answered the phone when he called for a job application form did not advise him that union affiliation would adversely affect his chance of being hired.

**B. Proceedings Below**

The Board's General Counsel contends that Leiser violated 29 U.S.C. § 158(a)(1)(it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title") and 29 U.S.C. § 158(a)(3)(it is an unfair labor practice for an employer to discriminate based on union membership or involvement). The Board in its Decision and Order affirmed the Administrative Law Judge's ("ALJ") determinations that Leiser violated § 158(a)(1) and (3) by discharging Coleman; Leiser violated § 158(a)(1) by threatening Williams with physical violence and by threatening to retaliate against Williams; Leiser violated § 158(a)(1) and (3) by suspending Williams; and Leiser violated § 158(a)(1) and (3) by refusing to hire Christopherson and Bright. Although the ALJ made other determinations which were likewise affirmed by the Board, Leiser did not petition this Court to review them.

In crafting remedies, the Board adopted the ALJ's recommendation that Coleman, Williams, Bright and Christopherson be made whole for all loss of backpay and benefits resulting from Leiser's unfair labor practices. The Board's adoption of other remedies recommended by the ALJ is not at issue here.

**C. Issues Presented for Review**

Leiser argues that the Board should not have affirmed the ALJ's determination that Leiser's discharge of Coleman violated the NLRA because it is not supported by substantial evidence. Leiser further argues that the Board should not have affirmed the ALJ's determination that Mr. Leiser violated the NLRA by threatening Williams with violence, threatening to retaliate against Williams, and suspending Williams because that determination is likewise not supported by substantial evidence. Next, Leiser argues that the Board should not have affirmed the ALJ's determination that Leiser's refusal to hire Bright and Christopherson violated the NLRA because it also is not supported by substantial evidence. Finally, Leiser argues that the Board erred by adopting the ALJ's recommendation that Coleman, Williams, Christopherson, and Bright are entitled to be made whole for all loss of backpay and benefits. The Board argues, on the other hand, that it is entitled to summary enforcement of its Decision and Order including summary enforcement of any uncontested portions of the Decision and Order.

## II. DISCUSSION

### A. Standard of Review

We have explained the standard of review in cases like this in *N.L.R.B. v. Velocity Exp. Inc.*, 434 F.3d 1198, 1201 (10th Cir. 2006):

> Our standard of review over a NLRB order is well-settled: "We will grant enforcement of an NLRB order when the agency has correctly applied the law and its findings are supported by substantial evidence in the record as a whole." *NLRB v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir.2003) (quoting *Miera v. NLRB*, 982 F.2d 441, 444 (10th Cir.1992)); *see also* 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-90, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Our scope of review is a limited one and an NLRB decision will not be overturned just because an appellate panel may have decided the matter differently. *Interstate Builders*, 351 F.3d at 1028; *Ready Mixed Concrete Co. v. NLRB*, 81 F.3d 1546, 1551 (10th Cir.1996) (review is "quite narrow"). We do not re-weigh the evidence or second guess the NLRB's factual inferences. *Interior Alterations, Inc. v. NLRB*, 738 F.2d 373, 376 (10th Cir.1984); *see also Universal Camera*, 340 U.S. at 488, 71 S. Ct. 456. Rather, we review only to ensure the NLRB acted within reasonable bounds and substantial evidence supports the order. *Interstate Builders*, 351 F.3d at 1028 (quoting *Ready Mixed Concrete Co.*, 81 F.3d at 1551). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 1027-28; *see also Dickinson v. Zurko*, 527 U.S. 150, 162, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999); *Allentown Mack Sales and Servs., Inc. v. NLRB*, 522 U.S. 359, 366-67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

In addition, we have explained that

> [c]redibility determinations are particularly the province of the ALJ and the Board. *Id*. at 1477. We "refuse to substitute our judgment on the credibility of witnesses for that of the ALJ, absent 'extraordinary circumstances.'" *McLane/Western*, 723 F.2d at 1458 (quoting *NLRB v. Dillon Stores*, 643 F.2d 687, 692 (10th Cir. 1981)). "[We] do not sit as a super trial examiner, and do not weigh the credibility of one witness against another, nor do we search for contradictory inferences." *Osteopathic Hosp. Founders Ass'n v. NLRB*, 618 F.2d 633, 636 (10th Cir. 1980) (quotations omitted).

*Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1551 (10th Cir. 1996).

**B. Merits**

1. *Mr. Leiser's Discharge of Coleman*

The critical question in both wrongful discharge and refusal to hire cases is whether anti-union animus motivated the employer's conduct. *N.L.R.B. v. Interstate Builders, Inc.*, 351 F.3d 1020, 1027 (10th Cir. 2003). Many times anti-union motivation can only be proven by circumstantial evidence. *Id*. "[I]n determining a company's motivation, '[t]he NLRB may consider factors such as the employer's knowledge of the employee's union activities, the employer's commission of other unfair labor practices, the timing of the employer's action, and the credibility of its explanation of the reasons for the discharge.'" *Id*. (citation omitted).

The Board uses a burden shifting approach in discharge cases (the so-called *Wright Line* test). First, the General Counsel '"must establish that the employee's protected conduct was a substantial or motivating factor in the discharge decision. . . .'" *Id*. (citation omitted). Then, "'the burden shifts to the employer to show that it would have reached the same decision absent the protected conduct.'" *Id*. (citation omitted). "'[A] flimsy or unsupported explanation may affirmatively suggest that the employer has seized upon a pretext to mask an anti-union motivation.'" *Id*. at 1034 (citation omitted). Interestingly, a "salt" or union organizer may lie to obtain a job "if the lie concerns merely his status as a salt, union organizer, or union supporter and not his qualifications for the job." *Hartman*

*Bros. Heating & Air Conditioning, Inc. v. N.L.R.B.*, 280 F.3d 1110, 1112 (7th Cir. 2002).

Leiser argues that Mr. Leiser's motivation in discharging Coleman was legitimate and lawful. Specifically, Leiser argues that Mr. Leiser fired Coleman because he had lied on his job application form, not because Coleman was affiliated with the Union. Leiser, therefore, asserts that the General Counsel did not establish a *prima facie* case of unlawful discharge. Leiser also attempts to get around the issue of the timing of the discharge (Mr. Leiser fired Coleman almost immediately after Coleman disclosed his Union ties) by contending that the timing issue raises only a mere suspicion of unlawful motive. Next, Leiser argues that even if the General Counsel met the burden of establishing a *prima facie* case of discrimination based on anti-union animus, Coleman would have been fired anyway for fabricating information on his job application form. Leiser maintains that since trust is a job qualification, as a salt, Coleman was not allowed to lie on his job application. Leiser also contends that Coleman's behavior was meant to shock Mr. Leiser into violating the NLRA.

Contrary to Leiser's arguments, evidence of an unlawful motivating factor is easily seen in the timing of the discharge which occurred at the most within minutes of Coleman's distribution of Union cards. *See N.L.R.B. v. Wilhow Corp.*, 666 F.2d 1294, 1302 (10th Cir. 1981) ("the timing of events is an important factor in determining the validity of an inference that there has been a discriminatory firing"). A finding of unlawful motivation is further supported by evidence that Mr. Leiser stated to Coleman shortly after the discharge that he would not have hired Coleman if he had known about

Coleman's Union activities. We conclude that this constitutes substantial evidence of an unlawful motivation for discharging Coleman. Consequently, the General Counsel demonstrated that Coleman's Union affiliation or activity was "a substantial or motivating factor in the discharge decision."

On the other hand, Leiser has not shown that Mr. Leiser would have discharged Coleman absent his Union activities. There is substantial evidence that Mr. Leiser's purported reason for discharging Coleman, i.e., that Coleman had lied on his job application form, is a pretext to hide an unlawful motivation in the decision to discharge Coleman. At the time Mr. Leiser discharged Coleman, Mr. Leiser knew that Coleman had "lied" on his job application form by simply omitting mention of Union affiliation. Omission of union affiliation on a job application form, however, is perfectly acceptable to avoid discrimination based on union activity. *See Hartman Bros. Heating & Air Conditioning, Inc.*, 280 F.3d at 1112. Also, Mr. Leiser did not know at the time of Coleman's discharge that Coleman had fabricated two former employers because Mr. Leiser had never checked Coleman's references nor had he verified Coleman's prior employment before discharging Coleman. Mr. Leiser's attempt to justify discharging Coleman based on fabricated employers is merely a post-hoc rationalization indicative of pretext. Finally, if Coleman had truthfully revealed all of his past work experience on his job application form, Mr. Leiser would have learned that Coleman actually had 12 years more work experience as an iron worker than what was shown on his job application form.

We conclude that the Board's affirmance of the ALJ's determination that Coleman was discharged in violation of the NLRA is supported by substantial evidence.

2. *Mr. Leiser's Treatment of Williams*

An employer violates 29 U.S.C. § 158(a)(1) "by threatening employees with reprisal for engaging in union activity. The test for a violation of [§ 158(a)(1)] is whether the employer engaged in conduct which reasonably tends to interfere with, restrain or coerce employees in the free exercise of their rights under § 7." *N.L.R.B. v. Oklahoma Fixture Co.*, 79 F.3d 1030, 1034 (10th Cir. 1996)(citations omitted). To decide generally whether an employer has violated 29 U.S.C. §158(a)(3), the Board likewise uses the *Wright Line* test: a violation of § 158(a)(3) "is established where General Counsel demonstrates that an employer's opposition to protected union activity was a motivating factor in a decision to take adverse action against an employee and the employer is unable to demonstrate that the adverse action would have been taken even absent the protected activity." *N.L.R.B. v. U.S. Postal Service*, 906 F.2d 482, 486 (10th Cir. 1990).

Leiser argues that the statements made by Mr. Leiser at the Scott City job site and the next day at the Kansas City job site were not threats of violence or retaliation. Instead, Leiser argues that Mr. Leiser was trying to explain that it would not be safe for Williams to stay at the Scott City job site because an anti-union employee might harm Williams now that it was known that he was a Union member. Furthermore, Leiser argues that Mr. Leiser did not suspend Williams by ordering him to leave the Scott City job site and go to the Kansas City job site the next day.

We conclude that when taken together the comment that Mr. Leiser "knew how to take care of people like" Williams and the statement that there was a Leiser employee who probably would kill Williams constitute substantial evidence of a threat of violence and retaliation against Williams for engaging in Union activities in violation of § 158(a)(1). Moreover, the evidence shows that Williams took Coleman with him to the Kansas City job site on the morning of April 12, 2005 because Williams was afraid a fight might break out.

There is also substantial evidence that Mr. Leiser suspended Williams from his job at the Scott City job site based on Williams's Union activity. First, Mr. Leiser asked Williams in a rather abrupt and probably angry manner to leave the Scott City job site within 15 minutes right after learning of Williams's Union activities. Second, Mr. Leiser commanded Williams to travel 350 miles to be at the Kansas City job site early the next morning without explaining the purpose of going to the Kansas City job site. Third, Mr. Leiser made a rather intimidating and hostile remark to Williams at the Scott City job site about knowing "how to take care of people like" Williams.

Clearly, suspending Williams for his Union activity "reasonably tend[ed] to interfere with, restrain or coerce" Williams in the free exercise of his rights as a Union member in violation of § 158(a)(1). Substantial evidence supports the General Counsel's position that Williams's Union activity was a substantial or motivating factor in Mr. Leiser's decision to pull Williams off of the Scott City job site. Leiser, however, has failed to show that Mr. Leiser would have nonetheless suspended Williams at that time

absent his Union activity. For these reasons, we conclude that there is substantial evidence that Leiser violated § 158(a)(1) and (3) by suspending Williams.

In sum, the Board's decision to affirm the ALJ's determination that Leiser violated the NLRA by threatening Williams with violence, threatening to retaliate against Williams, and suspending Williams for engaging in Union activities is supported by substantial evidence.

3. *Refusal to Hire Christopherson and Bright*

We have articulated the elements of a refusal to hire violation of the NLRA as follows:

> To establish a discriminatory refusal to hire, the General Counsel must, under the allocation of burdens set forth in *Wright Line*, 251 NLRB 1083 (1980), *enfd*. 662 F.2d 899 (1st Cir.1981), *cert. denied* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), first show the following at the hearing on the merits: (1) that the respondent was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants. Once this is established, the burden will shift to the respondent to show that it would not have hired the applicants even in the absence of their union activity or affiliation.

*Interstate Builders, Inc.*, 351 F.3d at 1035-36 (citation omitted).

Leiser argues that even though Mr. Leiser may have stated that he would not hire someone affiliated with the Union, he actually has hired persons affiliated with the Union and that Union affiliation does not have anything to do with the hiring decision. Leiser

notes that in June 2005, Mr. Leiser offered jobs to five known Union iron workers but they did not accept the job offers. Leiser also argues that Mr. Leiser would not have hired Christopherson and Bright because they did not have any recent field experience. In addition, Leiser contends that it received Christopherson and Bright's job application forms after the advertised positions had been filled. Leiser further contends that Ms. Leiser hired Barnum instead of considering Christopherson and Bright because she had previously spoken with Barnum. Finally, Leiser notes that none of the applicants whose applications were put in the folder with Christopherson and Bright's applications were interviewed or hired.

The evidence, however, clearly shows that Leiser continued to accept applications and make new hires after having received Christopherson and Bright's job applications although Christopherson and Bright's applications respectively showed 24 and 28 years of iron work experience. Furthermore, it is appropriate to take into account the fact that Leiser had previously engaged in other unfair labor practices with respect to Coleman and Williams in determining the existence of anti-union animus. *See Interstate Builders, Inc.*, 351 F.3d at 1027. Also, Leiser's hiring of other Union workers "is not dispositive. As the NLRB notes, an employer's failure to take action against 'all pro-union employees does not necessarily undermine the NLRB's finding of unlawful motivation.'" *MJ Metal Products, Inc. v. N.L.R.B.*, 267 F.3d 1059, 1066 (10th Cir. 2001). Moreover, Christopherson and Bright stated on their job application forms that they were Union organizers, not merely Union members. This is another factor to be considered in

determining anti-union animus. *See Fluor Daniel Inc.*, 311 N.L.R.B. 498, 500 (1993), *enforcement granted in part*, *N.L.R.B. v. Fluor Daniel, Inc.*, 161 F.3d 953 (6th Cir. 1998)(making distinction between union organizer who will exercise statutory right to organize as opposed to an employee who has merely worked for a union contractor). Anti-union animus is further shown by Ms. Leiser's decision to hire Barnum instead of Christopherson or Bright based on Ms. Leiser merely returning Barnum's telephone message asking for a job application form. We conclude that there is substantial evidence that Leiser continued to hire iron workers after Christopherson and Bright submitted their job applications forms, that Christopherson and Bright had relevant and substantial experience to perform the jobs as advertised, and that there was anti-union animus involved in the decision to not hire Christopherson and Bright.

The next question then is whether, absent Union affiliation, Mr. Leiser still would not have hired Christopherson and Bright. Leiser attempts to prove this by citing to Christopherson and Bright's lack of relevant recent work experience as a legitimate reason for not hiring Christopherson and Bright. Here, even if Christopherson and Bright's relevant experience is not recent it is nevertheless extensive and there is no evidence that Christopherson and Bright could not have performed the advertised jobs.[3] Without evidence that Christopherson and Bright were incapable of performing the advertised jobs, we can only conclude that Leiser failed to demonstrate that it would not

---

[3]Incidentally, when Leiser hired David Skinner, his job application form indicated that he had not worked as an iron worker for approximately five years.

have hired Christopherson and Bright absent Union affiliation. We, therefore, conclude that substantial evidence supports the Board's affirmance of the ALJ's determination that Leiser's failure to hire Christopherson and Bright violated the NLRA.

4. *Backpay*

Leiser argues first that it would be inappropriate to award backpay to Christopherson and Bright because they were not qualified applicants. In making this argument, Leiser refers to the after acquired evidence doctrine. The after acquired evidence doctrine "holds that there is no right to backpay if in the course of litigation over a discriminatory or otherwise unlawful discharge the employer unearths evidence that, had he known it at the outset, would have caused him, without fault, to refuse to hire the employee." *Hartman Bros. Heating & Air Conditioning, Inc.*, 280 F.3d at 1115. Leiser further argues that if backpay is appropriate as to Coleman and Williams, it should not extend beyond April 12, 2005 because Coleman rejected Mr. Leiser's offer of employment on April 12, 2005 and Williams voluntarily left the job on April 12, 2005 by stating he was going on strike. Generally, Leiser argues that awarding backpay would be a windfall to the "salts" and would be punitive in nature instead of being compensatory.

Nevertheless, as the Board correctly contends, the issue of a specific backpay period is premature. Although it is well-established that salts are generally eligible for backpay under the NLRA, *Oil Capital Sheet Metal, Inc. And Sheet Metal Workers Local 270*, 349 N.L.R.B. No. 118, *4 (2007), the reasonableness of a backpay period is determined in a compliance proceeding, a proceeding which has not yet been held in this

case. *See Sure-Tan, Inc., v. N.L.R.B.*, 467 U.S. 883, 902 (1984) (recognizing "the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy. . . .").

In addition, Leiser cannot raise the issue of the appropriateness of a backpay order because Leiser did not object to the ALJ's recommendation of a backpay order before the Board.[4] 29 U.S.C. § 160(e)("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). Even so, Leiser argues that since the Board also filed a cross-petition to enforce the Decision and Order, all of the Board's conclusions are subject to appellate review. We reject this argument in light of § 160(e) and note that Leiser failed to provide any compelling legal support for this argument.

Furthermore, the remedies devised by the Board are subject to only limited judicial review. *See Sure-Tan, Inc.*, 467 U.S. at 898-99 (1984). In fact, courts of appeals "should not substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices." *Id*. at 899. "This deference, however, ends when the order 'is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA].'" *Velocity*, 434 F.3d at 1202 (citation omitted). That simply is not the case here.

---

[4]Leiser did object to starting backpay for Coleman prior to April 12, 2005, but Leiser did not generally object to the ALJ's recommendation of a backpay order.

Moreover, the application of an after acquired evidence doctrine with respect to Christopherson and Bright is questionable. The doctrine applies to discharged employees rather than to mere job applicants. *See, e.g.*, *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 353 (1995); *Marshall Durbin Poultry Co.*, 310 N.L.R.B. 70 (1993), *enforced in part*, 39 F.3d 1312 (5th Cir. 1994); *John Cuneo, Inc.*, 298 N.L.R.B. 856 (1990). Leiser acknowledges this problem by stating in its supporting brief at 29 that "[t]he obstacle here is that these cases involve evidence regarding *employees*, whereas the instant matter involves evidence of *applicants*."

Finally, we are compelled to accept the credibility determination of the ALJ who found that Mr. Leiser did not offer Coleman reinstatement on April 12, 2005. Consequently, Leiser cannot argue that Coleman's award of backpay should necessarily end on April 12, 2005. We, therefore, determine that Leiser's challenge to the reasonableness of a backpay period is premature and that the Board's adoption of the ALJ's recommendation to order a general award of back pay was proper and "within reasonable bounds."

## III. CONCLUSION

Leiser's petition for review is DENIED and the Board's cross-petition for enforcement is GRANTED.

Entered for the Court

James A. Parker
Senior District Judge