# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 17-2281

———————————————

Bussen Quarries, Inc.

*Petitioner*

v.

Alexander Acosta, Secretary of Labor; Federal Mine Safety and Health Review
Commission; Mine Safety and Health Administration, MSHA

*Respondents*

——————

Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission

——————

Submitted: April 11, 2018
Filed: July 16, 2018

——————

Before BENTON, MELLOY, and GRASZ, Circuit Judges.

——————

GRASZ, Circuit Judge.

The Secretary of Labor's ("Secretary") Mine Safety and Health Administration ("MSHA") issued a citation to Bussen Quarries, Inc. ("Bussen"). The Secretary claimed Bussen violated federal regulation 30 C.F.R. § 56.15005, which requires the use of certain fall-protection equipment at surface metal and nonmetal mines when

working where there is a danger of falling. Our review focuses on whether there is enough evidence to support the citation.

## I. Background

Bussen owns and operates the Jefferson Barracks mine, a limestone quarry located in St. Louis County, Missouri. As part of its mining process, Bussen uses explosives to blast through the limestone and rock. The miners bore long holes into the rock along a highwall,[1] load explosives into the holes, and detonate the explosives. Due to natural conditions, there are times when the drilled holes contain excessive water, which interferes with the detonation. Miners will therefore check the water level and, if necessary, pump the water out. A hose is attached to one end of the pump, which suctions the water through the hose and discharges it out a spout on the other end of the pump. To make the pump mobile, Bussen attaches the pump to a two-wheeled dolly, which is referred to as the pump cart.

On the morning of December 2, 2014, MSHA mine inspector Gary Swan ("Inspector Swan") arrived at the Jefferson Barracks mine to conduct an inspection. Inspector Swan observed a crew of four miners, including lead blaster David Becker, working on the surface of the State Ledge highwall. Inspector Swan also saw the pump cart, which he alleged was approximately four and one-half feet from the edge

---

[1]MSHA regulations refer to, but do not define, a "highwall." *See e.g.*, 30 C.F.R. §§ 77.1000, 77.1006. The former United States Bureau of Mines published a dictionary of mining terminology, which defined a highwall as "[t]he unexcavated face of exposed overburden and coal or ore in an opencast mine, or the face or bank on the uphill side of a contour strip mine excavation." Bureau of Mines, U.S. Dep't of the Interior, *Dictionary of Mining, Mineral, and Related Terms* (2d ed. 1996), https://www.webharvest.gov/peth04/20041015011634/imcg.wr.usgs.gov/dmmrt/. For purposes of this appeal, the term is used to refer to a wall of unexcavated limestone, on top of which is a surface area where the miners worked.

of the highwall with its handles pointed toward the highwall edge. The drop-off from the edge of the highwall is roughly seventy feet.

Inspector Swan approached the group and began talking to Becker. Inspector Swan expressed concern about the pump and its proximity to the highwall edge. Becker, who was standing roughly seven feet away from the highwall edge, grabbed the pump cart, swung it around, and pulled it toward him so that it was in line with the drill holes. Inspector Swan asked Becker about fall protection equipment and Becker explained that it was in a nearby pickup truck, but was not needed.

After the inspection was completed, Inspector Swan explained to Bussen safety manager Dana Bussen that he was going to issue Bussen a citation because the pump was "way too close to the highwall." He then wrote a citation[2] alleging a violation of 30 C.F.R. § 56.15005, which is titled "Safety belts and lines," and relevantly provides that "[s]afety belts and lines shall be worn when persons work where there is danger of falling."

The citation alleged:

> There was a portable pump on a two wheel cart being used on the highwall above the state rock ledge to pump out drill holes for loading. The pump was located between the edge of the highwall and the last row of drill holes, approximately 4 feet from the edge. The back of the two wheel cart was facing the highwall edge. This could put a person using the cart approximately 2 to 3 feet from the edge of the highwall with their back to the edge. This practice exposes miners to a fall hazard.

The Secretary proposed a civil penalty in the amount of $6,300.00. This penalty was a special assessment issued pursuant to 30 C.F.R. § 100.5, which allows

---

[2]The citation designated the violation as significant and substantial and the result of high negligence on the part of Bussen.

MSHA "to waive the regular assessment . . . if it determines that conditions warrant a special assessment." MSHA explained the special assessment was justified here "because the cited standard is a 'Rules to Live by' standard" and "greater deterrence than the regular assessment penalty" was needed. In its Narrative Findings for a Special Assessment, MSHA alleged that "a miner failed to use fall protection when he was working two to three feet from the edge of a highwall, where there was a danger of falling" and that he "had been working from the rear of a cart that was facing the highwall edge."

After Bussen contested the proposed assessment, the Secretary filed a Petition for the Assessment of Civil Penalty with the Federal Mine Safety and Health Review Commission (the "Commission") and the case was assigned to an Administrative Law Judge ("ALJ"). The parties submitted prehearing statements. In describing the citation, the Secretary explained that "Inspector Gary Swan issued the violation after he learned that a miner operated, without using safety belts or lines, a portable pump on a two wheel cart to pump out drill holes for loading and the miner did so within about four feet from the edge of the highwall creating a danger of falling."

The case proceeded to a hearing, where five witnesses testified, including Becker and Inspector Swan. Becker explained that he had placed the pump cart in a certain spot earlier in the day and, when a powder truck showed up that he needed to unload, he took the pump cart "and spun it out of my way to clear a path for us to start unloading bags of powder." Becker claimed he knew he was at least seven feet away from the edge when he moved the pump cart because that was Bussen's policy and because his feet were near the drilled holes, which were approximately eight feet from the edge. Becker claimed no miners used the pump that day.

Inspector Swan testified that when he first observed the pump, there were "four people in the area [of the pump] at the time." He testified that with the positioning of the handles toward the highwall, "it could, if they needed to pry it back to move

-4-

it, to move the wheels, it would put someone, you know, between the pump and the highwall." Inspector Swan acknowledged that he did not see any of the miners using the pump. He also admitted that he did not observe anyone working between the edge of the high wall and the back of the pump. He testified, however, that when Becker retrieved the cart during their confrontation, "that would have put him across that – what I call a safe distance from the high wall."

The Secretary submitted into evidence an MSHA PowerPoint presentation titled "Fall Prevention on Highwalls," which referenced the "Fall Hazard Zone." The presentation described the fall hazard zone as six feet or less from a stable crest or six feet or less from unstable ground or footing. Bussen submitted into evidence its policy requiring its employees to stay at least seven feet away from a drop-off or unstable backbreak unless they are properly tied off.

After the hearing, the ALJ found the Secretary proved that Bussen violated 30 C.F.R. § 56.15005, and ordered Bussen to pay a penalty of $6,300.00. The ALJ reasoned that "the position of the pump together with the absence of any warnings near the edge created a danger of falling." Acknowledging it was "difficult to know whether the pump would have been used in the position observed by the inspector," the ALJ "agree[d] with the inspector's reasonable inferences that these other miners could have used or moved the pump from its location near the edge." Either way, the ALJ explained, the "miner would enter the fall hazard zone."

Further, the ALJ discounted Becker's testimony that he never entered the fall hazard zone—which she suggested was within six feet of the edge—stating it was "difficult to imagine" he did not cross into the zone "when he placed the pump in the position initially observed by the inspector," and "most likely" did so by pushing the cart by its handles. The ALJ also concluded that Becker did not use fall protection when moving the pump to its position and expressed doubt that other miners would use fall protection "in order to perform the simple task of moving the pump."

-5-

The Commission, which at that time consisted of four Commissioners, exercised its discretion to consider Bussen's petition for discretionary review, *see* 30 U.S.C. § 823(d)(2). The Commissioners were evenly divided, however, on whether to affirm or reverse the ALJ's decision in its entirety and, therefore, wrote two separate sections of the opinion stating their respective conclusions on the ultimate issue.

The two Commissioners who wrote in favor of affirming the ALJ's decision concluded that substantial evidence supported a finding of violation because they agreed with the ALJ's conclusion "that David Becker's positioning of the pump cart during the unloading of the powder truck placed him less than four and one-half feet from the highwall's edge without fall protection." The Commissioners explained that the ALJ's conclusion was based on an inference that "the handles pointing towards the highwall edge indicate that [Becker] was between the pump cart and the highwall edge," and the inference was reasonable because it was based on "a commonsense view of how the cart in question had been placed in the position where Inspector Swan observed it."

The two Commissioners who wrote in favor of vacating the citation concluded that the ALJ's inference that Becker placed himself in danger of falling was "not supported by substantial evidence" and therefore was "not reasonable." The Commissioners explained that Becker's "sworn testimony, his demonstration of his action, the evidence at the scene, and plain common sense contradict the [ALJ's] inference." The Commissioners also criticized the ALJ for "basing the inference on the operator's failure, in the [ALJ's] view, to comply with a host of non-mandatory safety suggestions made in informal MSHA presentations." The Commissioners further criticized the ALJ's treatment of the six-foot fall hazard zone as a "mandatory standard upon which one may ground a strict liability violation," reasoning the approach was "inconsistent with the actual regulation language promulgated by the

Secretary" and "[t]he Secretary did not introduce any evidence for the proposition that every incursion within six feet of a crest creates a danger of falling."

The Commission explained the effect of the split decision was to allow the ALJ's decision to stand as if affirmed. Bussen filed a petition to review with this Court pursuant to 30 U.S.C. § 816(a)(1).

## II. Discussion

Bussen argues the citation cannot stand because the Secretary failed to present evidence that any of Bussen's miners violated 30 C.F.R. § 56.15005. Bussen contends that the ALJ's ultimate findings depended on improper conjecture and speculation, as well as an unfounded decision to discredit Becker's testimony regarding how he placed the pump cart near the highwall edge. The Secretary meanwhile urges us to uphold the citation, arguing the ALJ made a rational inference that Becker worked in an unsafe area without wearing required fall protection and that we should not disturb the ALJ's credibility findings.

We begin our analysis with the text of 30 C.F.R. § 56.15005, which relevantly states "[s]afety belts and lines shall be worn when persons work where there is danger of falling." We generally review the interpretation of a regulation de novo. See *Northshore Mining Co. v. Sec'y of Labor*, 709 F.3d 706, 708 (8th Cir. 2013). Based on the plain language of the regulation, a violation occurs where (1) a person was working, (2) without wearing safety belts and lines, and (3) where there was a danger of falling.

With regard to the third element—"where there was a danger of falling"— the ALJ repeatedly referenced and seemed to rely on the concept of a "fall hazard zone." This concept came from MSHA's "Fall Prevention on Highwalls" presentation that endorsed the concept of a six-foot fall hazard zone. Bussen's official policy

-7-

recognized the concept of a fall hazard zone, but increased the distance to seven feet from the edge. For purposes of this case, it is important to recognize that MSHA has not adopted, through its formal rulemaking process, the fall hazard zone as a mandatory standard.[3] Nor did the Secretary put forth evidence establishing that every encroachment of the fall hazard zone necessarily creates a danger of falling. Consequently, while the fall hazard zone may be good practice, it does not control the legal analysis in this case.

The parties both maintain that the controlling issue on appeal—whether Bussen worked in an area where there was a danger of falling without fall protection— is at its core a factual issue that we review for substantial evidence. *See* 30 U.S.C. § 816(a) ("The findings of the Commission with respect to questions of fact, supported by substantial evidence on the record as a whole, shall be conclusive.") Both parties also ultimately take the position that because the Commission was split evenly on this issue, our substantial evidence inquiry is focused on the ALJ's finding.[4]

---

[3]The Presentation included a disclaimer stating that the "program does not establish official MSHA policy on all possible methods of compliance at every mining operation" and instead "provides suggestions and recommendations to the mining industry for educational purposes."

[4]We are unaware of any past instances where we have reviewed an ALJ decision because the Commission reached a split decision. However, we have reviewed an ALJ's finding for substantial evidence after the Commission declined discretionary review. *See Pattison Sand Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 688 F.3d 507, 512 (8th Cir. 2012). Further, the Tenth Circuit applied the substantial evidence standard to an ALJ decision when the Commission was evenly divided. *See Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1191 (10th Cir. 2008). In the absence of any arguments to the contrary by the parties here, we take the same approach for purposes of this appeal.

"Substantial evidence means 'more than a scintilla but less than a preponderance.'" *See Pattison Sand Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 688 F.3d 507, 512 (8th Cir. 2012) (quoting *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009)). Under this deferential standard of review, "[w]e may not reverse merely because substantial evidence may also support an opposite conclusion." *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009). Yet in order to affirm, the record evidence "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). *See also Sinclair & Valentine Co. v. NLRB*, 549 F.2d 1183, 1186 (8th Cir. 1977) (setting aside an administrative decision when it "seem[ed] grounded upon conjecture rather than substantial evidence"). Further, we "must 'take into account whatever in the record fairly detracts from [the] weight' of the evidence that supports the finding." *Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n*, 519 F.3d 1176, 1194 (10th Cir. 2008) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Central to the ALJ's finding that the third element was met is the inference that Becker placed himself in danger of falling when he moved the pump cart to the position at which it was observed by Inspector Swan.[5] Becker, however, was the only

---

[5]The ALJ also found that Becker created a danger of falling for other miners by placing the pump cart so close to the edge of the highwall with its handles facing the edge. To the extent the ALJ believed the possibility of other miners moving or using the cart in that position constituted a violation of the regulation, this was error. Under the plain language of the regulation, a violation only occurs if a miner works in an area with a danger of falling and does not wear the specified fall protection. As the Commissioners who criticized the ALJ decision recognized, "[t]here simply is no basis in the Mine Act to cite an operator and assess a penalty for violations that have not yet occurred but that the inspector, Secretary, or Judge speculates may happen in the future."

person who knew how the pump cart arrived in the position where it was observed by Inspector Swan. From this fact, Bussen argues the ALJ's findings that Becker or other miners violated the regulation are based on pure speculation and cannot stand. Bussen also argues that the ALJ committed reversible error by discrediting Becker's testimony, arguing there was no basis to do so and therefore we need not defer to the credibility determination.

We give great deference to an ALJ on such a credibility determination. *See Mercier v. U.S. Dep't of Labor*, 850 F.3d 382, 388 (8th Cir. 2017); *accord Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1107 (D.C. Cir. 1998). But we need not determine whether the ALJ's credibility finding survives in this case.

Admittedly, we have serious doubts regarding the validity of the ALJ's decision to disbelieve Becker's testimony as to how he put the pump cart where Inspector Swan found it. Becker demonstrated to the ALJ how he spun the pump cart to place it out of the way while he stood more than seven feet from the highwall edge and his testimony has been consistent[6] from the time he talked to Inspector Swan at

---

[6]The same cannot be said of the Secretary's shifting justification for the citation. The citation itself states the placement of the pump cart "*could* put a person using the cart approximately 2 to 3 feet from the edge of the highwall with their back to the edge. This practice exposes miners to a fall hazard." (emphasis added). The Narrative Findings for a Special Assessment changed course and alleged that "a miner failed to use fall protection when he was working two to three feet from the edge of a highwall, where there was a danger of falling" and that he "had been working from the rear of a cart that was facing the highwall edge." The Secretary then stated in its prehearing submission to the ALJ that "Inspector Gary Swan issued the violation after he learned that a miner operated, without using safety belts or lines, a portable pump on a two wheel cart to pump out drill holes for loading and the miner did so within about four feet from the edge of the highwall creating a danger of falling." At the hearing, however, Inspector Swan admitted under oath that he did not see or know of Becker or any other Bussen miner operating the pump.

the mine until the hearing. Moreover, the ALJ gave no real indication as to why she disbelieved Becker and we have not detected any legitimate reason.

The Secretary defends the ALJ's credibility determination, in part, by arguing "the judge heard two competing versions of events and decided between them—exactly what factfinders are supposed to do." While we agree as to the proposition of law, it is not applicable here because there were *not* two competing versions of events. Only Becker testified as to how the pump cart arrived at the observed location. Inspector Swan admitted he did not see how the pump cart was moved or know how it occurred, and the Secretary did not present any other witness who possessed any relevant knowledge on the issue.

Be that as it may, it is unnecessary to disturb the ALJ's credibility determination to decide in Bussen's favor. This is true because there is not substantial evidence supporting the ALJ's finding of a violation. As the Secretary admits, it was not Bussen's burden to prove it did not violate the regulation, but instead the Secretary's burden to establish that a violation occurred. *See* 29 C.F.R. § 2700.63(b) ("The proponent of an order has the burden of proof."); *Keystone Coal Mining Corp.*, 151 F.3d at 1103 ("The ALJ recognized and the Commission affirmed that the Secretary bore the burden of proving [a violation] by a preponderance of the evidence"); *cf. Nat'l Indep. Coal Operators' Ass'n. v. Kleppe*, 423 U.S. 388, 395 (1976) (explaining that the government "has the burden of proving the penalty by a preponderance of the evidence"). The Secretary failed to meet his burden.

Indeed, our review of the record shows there is not competent evidence supporting the ALJ's inference that "Becker pushed the pump by its handles rather than carrying it or pushing it or pulling it from the side opposite the handles," and thus that he walked between the pump cart and the highwall edge. To the contrary, even ignoring Becker's testimony as to what occurred, there was substantial evidence

-11-

showing that Becker moved the pump cart into the so-called fall-hazard zone while he remained a safe distance from the highwall edge.

For example, Inspector Swan was standing next to Becker when Becker retrieved the pump cart, revealing that Becker's method of moving the pump cart without approaching the edge was easily accomplished. Moreover, the ALJ found that there were no recent footprints near the edge of the highwall, but that there were older footprints near the edge that were covered in rock dust. This suggests that no miner, including Becker, had walked close to the edge that morning. Further, Bussen had a policy forbidding its employees to walk that close to an edge without fall protection, and had trained Becker on that policy. These facts all weigh against the ALJ's inference as to how Becker moved the pump cart.

In the absence of actual evidence showing that Becker walked between the pump cart and the highwall ledge—and with substantial evidence supporting a contrary conclusion—we conclude the ALJ's inference that Becker worked in an area where there was a danger of falling was unreasonable because it was based on nothing more than "suspicion," which is legally insufficient. *See Columbian Enameling & Stamping Co.*, 306 U.S. at 300 (explaining the mere suspicion of the existence of a fact is not enough to support an agency finding under the substantial evidence standard); *Sinclair & Valentine Co.*, 549 F.2d at 1184, 1186 (holding an agency finding "grounded upon conjecture rather than substantial evidence" must be vacated).

The Secretary criticizes Bussen's reliance on past cases where we have stated that in order to avoid a directed verdict, "[t]here must be a conflict in the substantial evidence and not merely speculation or conjecture." *J.E.K. Industries, Inc. v. Shoemaker*, 763 F.2d 348, 353 (8th Cir. 1985). According to the Secretary, Bussen's reliance on these cases in support of the proposition that speculation cannot support an ALJ decision is misplaced because the directed verdict standard is a "wholly

different—and much more demanding—standard than the deferential substantial evidence standard that governs judicial review of agency decisions." The Secretary's argument misses the purpose of the citations here: the amount of evidence needed to *affirm* the ALJ here and to *deny* a directed verdict is the same. See *Columbian Enameling & Stamping Co.,* 306 U.S. at 300 (explaining the evidence "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from is one of fact for the jury"). Both standards are no doubt highly deferential. Under either, however, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Id.*

Finally, by reaching our conclusion in this case, we do not, as the Secretary suggests, endorse a view that an MSHA inspector must personally observe a violation in order to hold a mine operator accountable for a violation of a safety standard. Depending on the circumstances of a particular case and the violation alleged, the Secretary may be able to prove a violation occurred by any number or combination of methods, including testimony from other witnesses, circumstantial evidence, past practices, statistics, and the absence of a company policy. What the Secretary cannot rely upon is mere speculation and conjecture that a violation occurred. To uphold a citation in such circumstances would flip the burden of proof and be fundamentally unfair to mine operators such as Bussen.

In sum, the Secretary proved, at most, that a pump cart was placed in a so-called fall hazard zone. There is not evidence to support a conclusion that Becker or any other miner approached the highwall edge when moving the pump cart or were otherwise working without safety belts and lines where there was a danger of falling. Accordingly, we hold that substantial evidence does not support the ALJ's finding that Bussen violated 30 C.F.R. § 56.15005.

## III. Conclusion

We grant Bussen's petition for review, reverse the ALJ's decision, and vacate the citation in its entirety.

_____