# United States Court of Appeals
### For the Eighth Circuit

_____

No. 24-2330

_____

Lee Michael Pederson

*Petitioner*

v.

U.S. Securities and Exchange Commission

*Respondent*

_____

No. 24-2526

_____

John Amster; Robert Heath

*Petitioner*s

v.

U.S. Securities and Exchange Commission

*Respondent*

_____

Petition for Review of an Order of the
Securities & Exchange Commission

_____

Submitted: May 14, 2025
Filed: August 22, 2025

_____

Before COLLOTON, Chief Judge, SMITH and SHEPHERD, Circuit Judges.
_____

SMITH, Circuit Judge.

Lee Michael Pederson, John Amster, and Robert Heath (collectively, "Petitioners") petition for review of a final order of the Securities and Exchange Commission (Commission) denying their applications for whistleblower awards in connection with the Commission's successful action enforcing the security laws in *SEC v. Honig*, No. 18-cv-08175 (S.D.N.Y.). We deny the petitions for review and Pederson's pending motion to compel.

I. *Background*

On September 7, 2018, the Commission filed a civil enforcement action against several defendants alleging that they perpetrated "highly-profitable 'pump-and-dump' schemes by artificially inflating the stock price" of their companies. *See SEC v. Honig*, No. 18-cv-08175 (S.D.N.Y. Sept. 7, 2018). The Commission alleged that Barry Honig led the scheme, which involved other defendants including Michael Brauser, Mark Groussman, and Phillip Frost. It alleged that Honig and his associates would acquire "large quantities of the issuer's stock at steep discounts" and then "engage[] in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume." Pederson's Addendum at 4. "Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors." *Id.* The Commission eventually obtained final judgments against the defendants and recovered over $11 million in sanctions.

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Act) says that the Commission "shall pay an award or awards to [one] or more whistleblowers who voluntarily provided original information to the Commission that led to the successful enforcement of the covered judicial or administrative action." 15 U.S.C. § 78u-6(b)(1). Thus, on March 29, 2019, the Commission's Office of the

Whistleblower (OWB) posted a Notice of Covered Action that "invit[ed] claimants to submit whistleblower award applications within 90 days." Pederson's Addendum at 4. Five claimants submitted timely applications. The Commission's Claims Review Staff issued a preliminary determination that awarded 30 percent of the monetary sanctions to one claimant, Daniel Fisher, and denied all other applications. Fisher was a co-founder of Biozone Pharmaceuticals, Inc.—a company at the center of the Commission's investigation. When Frost took over Biozone, Fisher "then became an Executive Vice President and Director." *Id.* at 14. Frost forced Fisher out of Biozone in 2012. Fisher submitted two whistleblower tips to the Commission in 2011 and 2012, attended a meeting with enforcement staff responsible for the investigation in October 2015, and responded to a subpoena from the Commission following that meeting.

Petitioners challenged the preliminary determination. *See* 17 C.F.R. § 240.21F-10(e). Upon review, the Commission entered a final order affirming the preliminary determination. It agreed that Fisher should receive the 30 percent award because he "provided new, helpful information that substantially advanced the investigation" in the October 2015 meeting and "provided useful additional evidence to the staff" in response to the subpoena. Pederson's Addendum at 6. In the meeting, Fisher "described various meetings he[] participated in with certain [d]efendants and other individuals, described the deal in which [Biozone] was created, and the events leading up to the promotion and market manipulation of [Biozone] stock, as well as the pump-and-dump that occurred with [Biozone]." *Id.* The Commission also affirmed the decision to deny all other applications. This appeal concerns two of the denied applications—Pederson's application and Amster and Heath's joint application.

## A. *Pederson*

Pederson is a patent attorney who "served as outside patent counsel for Biozone for over a decade, until 2012." Pederson's Br. at 5. Pederson submitted his first whistleblower tip to the Commission in 2013. His tip described a pump-and-dump scheme involving Frost and Biozone. In this tip, Pederson discussed a lawsuit

that Fisher filed against Biozone, Frost, and other eventual defendants, in which Fisher described the pump-and-dump scheme. Notably, Fisher settled this case in 2013. That settlement agreement included a non-disparagement clause, and pursuant to that agreement, "Fisher was supposed to withdraw grievances that he filed with the [Commission] and FBI concerning the defendants." *Fisher v. Biozone Pharms. Inc.*, No. 12-cv-03716, 2017 WL 1097198, at *3 (N.D. Cal. Mar. 23, 2017) (unpublished). In 2017, a federal district court found that Fisher violated that 2013 agreement and that he had not withdrawn his grievances. *Id.* The court "order[ed] Fisher] to withdraw [those] grievances." *Id.* at *8.

In Pederson's initial tip, he explained that he was "not completely at liberty to disclose or discuss everything [he knew] about this situation." Pederson's App. at 53. Thus, he acknowledged that his tip included "very little independent knowledge" and was instead "comprise[d of] primarily independent analysis . . . supported by publicly available information." *Id.* Over the next several years, Pederson "submitted several more [tips] regarding Honig, Frost, and Brauser, as well as sending dozens of emails to [Commission] staff," in which he "repeatedly alleged that Frost [was] the leader of a 'white collar gang' that specialize[d] in market manipulations." *Id.* at 21.

In June 2014, Pederson contacted Fisher. Pederson says that "the two [then] commenced their cooperation in disclosing fraudulent activities by the Frost Group." Pederson's Br. at 7. But according to Fisher, the two merely "commiserated with each other." Commission's App. at 40. Fisher said that Pederson had "virtually no information helpful to [him]" because Pederson "only provided [him with] publicly available information, nothing else." *Id.* at 40–41. But Fisher did share "with [Pederson] information that would be helpful." *Id.* at 40.

Pederson also contacted other entities with information about the scheme. For example, in November 2014, Pederson emailed an attorney at the U.S. Attorney's Office for the Northern District of California (NDCA) with a copy of another complaint that Fisher filed against Biozone (the Garcia Property Litigation), which

"concern[ed] a drug manufacturing facility leased to Biozone." Pederson's Br. at 8. In the email, Pederson referred to himself as Fisher's attorney. He also acknowledged that his email contained "no new factual information . . . that ha[d] not previously been provided to law enforcement." Pederson's App. at 117.

In October 2015, Commission enforcement attorney Katherine Bromberg emailed Fisher and invited him to an in-person meeting. Fisher accepted the invitation and added Pederson to the email chain. In his response, Fisher said, "My attorney, Lee Pederson, is available on Thursday via phone. . . . We have a lot of information to [provide] the [Commission]." *Id.* at 155. Fisher told Bromberg that Pederson would "likely be willing to provide the [Commission] important information" because he was a "potential plaintiff" against Biozone and asked that the Commission "speak with . . . Mr. Pederson on Wednesday." *Id.* Ultimately, Fisher attended the meeting alone. After that meeting, Pederson on several occasions sent Bromberg email copies of Fisher's litigation documents, once at Bromberg's request.

In November 2015, Fisher and Pederson discussed splitting a potential whistleblower award. Pederson emailed Fisher: "As we discussed and agreed last evening, if the [Commission] obtains disgorgement penalties from the Frost gang[,] . . . we will work together to apply for one or more whistleblower awards, and we will split the proceeds of any such award(s) equally." *Id.* at 159. Pederson requested that Fisher "respond with [his] concurrence." *Id.* Fisher replied that "[t]he agreement [was] acceptable" with two additional provisions. *Id.* Pederson then emailed the same agreement with Fisher's requested additions and asked Fisher to "confirm." *Id.* Fisher did not confirm.

In December 2015, Fisher received a subpoena from the Commission. Fisher forwarded the email with the subpoena to Pederson "as [his] attorney and co-beneficiary, if there is a[] Whistle Blower's Reward [sic]." *Id.* at 161. But Fisher's actual legal counsel responded to the subpoena and "produc[ed] documents in

response to the subpoena [only] on behalf of Fisher." *Id.* at 41. Pederson did not participate in the subpoena.

Pederson and Fisher's relationship soured around 2016 when Pederson "sent [Fisher] an invoice for legal services even though [Fisher] had no engagement agreement." Commission's App. at 46. Pederson later sued Fisher for equitable remedies, and in that complaint, Pederson acknowledged that "Pederson and Fisher worked together" to "seek redress for the harms caused to them by Frost" but that "[t]he details of the agreement between [them] were never finalized." *Pederson v. Frost*, No. 19-cv-01777, R. Doc. 1, ¶ 6 (D. Minn. July 8, 2019). The court "dismissed the complaint due to lack of personal jurisdiction." Resp't's Br. at 19. Fisher also sued Pederson "seeking a declaratory judgment to establish that [Fisher] had no monetary liability to Pederson regarding Pederson's role in the Garcia Property [Litigation]," and Fisher obtained a default judgment against Pederson. Pederson's Br. at 14.

When the Commission posted the Notice of Covered Action, Pederson filed a timely application and "sought an award based on his independent tips submitted in 2013 and 2014, as well as his joint efforts with Fisher." *Id.* The Claims Review Staff preliminarily denied his application because his "information was not used in, nor had any impact on, the charges brought by the Commission." Pederson's App. at 8. The staff acknowledged that "[e]nforcement staff responsible for the Covered Action received information from [Pederson]" but said that his "information was duplicative of information [it] . . . had obtained prior." *Id.* The staff said his "information was general in nature," "was based solely on publicly available information [e]nforcement staff already had in its possession," and "did not include any useful insight separate and apart from what was reflected in the publicly available materials." *Id.* The staff also rejected Pederson's argument that he "submitted information . . . jointly with [Fisher]." *Id.* at 8 n.1. The staff noted that Fisher submitted his tips individually not jointly. Fisher attended the October 2015 meeting alone, "during which [he] provided valuable new information . . . . based on [his] own personal independent knowledge and experiences." *Id.*

Pederson challenged the preliminary determination. In response, the Commission provided him with the record that staff used to make the determination, including a sworn declaration from Bromberg. In it, Bromberg said that Pederson's initial tip was "not referred to [e]nforcement staff for further review or action . . . . [b]ecause of the general nature of the complaint and its apparent reliance on publicly available materials." *Id.* at 21. Bromberg acknowledged that Pederson reached out to Commission staff "on an almost exclusively one-sided basis" but said that "staff declined to schedule follow up communication with him because [it] concluded that he did not possess" helpful information. *Id.* at 22. She also said that she understood that Pederson emailed her a copy of Fisher's complaint after the October 2015 meeting at Fisher's request and that Pederson had that complaint "because Fisher had provided those materials to Pederson in connection with Pederson's lawsuit against Frost." *Id.* at 22 n.1.

"Following [Pederson's] request for reconsideration, [Commission] staff . . . solicited additional information and documents from [Fisher] and [Pederson] to clarify their relationship." *Id.* at 35. The Commission deposed both Fisher and Pederson. Fisher testified that he did not work with Pederson to prepare Fisher's own tips and that the pair had "no written agreement" to share information. Commission's App. at 40. Fisher also testified that Pederson "was not [his] attorney specifically" and that they "had no engagement agreement." *Id.* at 42. Pederson testified that he did not help with Fisher's 2011 and 2012 tips. Pederson said that Fisher referred to him as Fisher's attorney because Fisher was "imprecise with language a lot of times" and "was used to doing it." *Id.* at 71–72. Pederson also acknowledged that he had no finalized agreement to split an award: He testified that he "d[id not] remember specifically" if Fisher orally agreed to the email and said that he "ha[d] no documentation" if Fisher did so. *Id.* at 88.

The Commission then entered a final order denying Pederson's application. In doing so, it credited a sworn supplemental declaration from Bromberg. First, the Commission agreed with the Preliminary Determination that Pederson and Fisher

were not joint whistleblowers. "[T]he touchstone for determining whether two individuals acted as joint whistleblowers turns on how the individuals presented themselves when providing the information to the Commission." Pederson's App. at 36. The Commission acknowledged that the emails between Fisher and Pederson, "if viewed in isolation, . . . could support [Pederson's] view." *Id.* at 37. But it said "that the record evidence taken as a whole weigh[ed] in favor of finding that [Fisher] and [Pederson] provided information individually." *Id.* It noted that the emails Fisher and Pederson exchanged never resulted in an "executed agreement"; that Fisher attended the October 2015 meeting and responded to the subsequent subpoena alone; and that Fisher and Pederson also submitted individual tips years apart. *Id.* "At no point during the investigation was [e]nforcement staff informed by [Fisher] or [Pederson], or by [Fisher's] counsel, that they were acting as joint whistleblowers or providing the information jointly." *Id.* at 36. Second, the Commission agreed that Pederson "did not individually provide original information that led to the success of the Covered Action" because his "information was not helpful." *Id.* at 37. Pederson then petitioned this court for review of that order.

### B. *Amster and Heath*

Amster and Heath were both executive officers at publicly traded companies. Both claim to be patent experts who "detected and reported the pump-and-dump schemes" in 2013. Amster and Heath's Br. at 4. In October 2013, Amster and Heath attended a meeting at the Commission's Washington D.C. office with the Assistant Director of Enforcement and several enforcement attorneys. In this meeting, they "presented five case studies of recent suspect pump-and-dump schemes," some of which involved Honig. *Id.* at 5. In November 2013, the pair attended another meeting at the D.C. office and "identified the top shareholders involved in the suspect market activity," which included several defendants in the Honig action. *Id.* at 6.

Amster and Heath filed a joint whistleblower award application. The Claims Review Staff preliminarily denied their application because they "did not provide original information that led to a successful enforcement action." Amster and Heath's App. at 252. The Claims Review Staff found that the "staff responsible for

the Covered Action did not receive [Amster] and [Heath's] information and never had any communications with [them]." *Id.* at 253. Because the "staff did not rely upon [their] allegations when conducting the investigation," the staff found that their "information was not used in, nor had any impact on, the charges brought." *Id.*

Amster and Heath challenged the preliminary determination. The Commission provided them with Bromberg's sworn declaration that said that "[t]he Honig [i]nvestigation was opened by [New York] [e]nforcement staff in February 2015 based on a referral . . . from the Division of Examinations [Exams]." *Id.* at 257. She confirmed that staff responsible for the enforcement action did not receive or review Amster and Heath's information until they filed their award application.

Amster and Heath, in their request for reconsideration, argued that "even if [Commission] staff members do not 'use' a whistleblower's original information within a particular investigation, [the regulations] may nevertheless entitle that whistleblower to an award if the information leads to a successful enforcement action in other ways." *Id.* at 286 (alteration and internal quotation marks omitted). Although Bromberg's declaration said that "the decision to open this investigation was based in part on past investigations of microcap fraud," they averred that "[i]f [their] disclosures had led to one such investigation, then . . . their original information *did* help cause the [Commission] to open this investigation." *Id.* at 287.

The Commission denied their application and entered a final order. The denial relied on and credited Bromberg's sworn supplemental declaration that said the "investigation was opened in February 2015 based on an Exams referral, and not because of [Amster and Heath's] information." *Id.* at 382. The Commission further clarified that the "Exams referral [was not] based on [their] information" and rejected their argument that "the investigation was opened based in part on a past microcap investigation that they may have helped open." *Id.* Amster and Heath petitioned the Ninth Circuit for review of that order. That petition was then consolidated with Pederson's petition in this court.

## II. *Discussion*

Whistleblower award determinations are "in the discretion of the Commission," and we "review the determination made by the Commission in accordance with section 706 of [the Administrative Procedure Act]." 15 U.S.C. § 78u-6(f). Accordingly, we "will 'hold unlawful and set aside agency action, findings, and conclusions' that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'unsupported by substantial evidence.'" *Meisel v. SEC*, 97 F.4th 755, 760–61 (11th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A), (E)). "Arbitrary and capricious review, at its core, measures if an agency action was irrational." *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 95 F.4th 573, 579 (8th Cir. 2024). We review the Commission's legal conclusions de novo and its factual findings for substantial evidence.[1] *Meisel*, 97 F.4th at 761. "[W]hatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks and citations omitted). "Under this deferential standard of review, we may not reverse merely because substantial evidence may also support an opposite conclusion. Yet in order to affirm, the record evidence must do more than create a suspicion of the existence of the fact to be established." *Bussen Quarries, Inc. v. Acosta*, 895 F.3d 1039, 1045 (8th Cir. 2018) (cleaned up).

## A. *Pederson*

Pederson asks us to vacate the Commission's final order and grant him the 30 percent award because the Commission (1) erred in finding that he was not a joint whistleblower with Fisher; (2) erred in denying his application based on his initial

---

[1]In his reply brief, Pederson argues that a deferential standard of review is not appropriate to review the Commission's whistleblower determinations. But Pederson acknowledged these standards of review in his opening brief and did not argue that deference was inappropriate. Because Pederson did not raise his challenge to the standards of review in his opening brief, his argument is waived. *See FTC v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009).

individual tips in 2013 and 2014; (3) violated his Fifth Amendment due process rights; and (4) erred in granting Fisher the 30 percent award.

### 1. *Joint Whistleblower Status*

The Commission rejected Pederson's argument that he should receive a whistleblower award because he provided information jointly with award recipient Fisher. The Commission said that "the touchstone for determining whether two individual acted as joint whistleblowers turns on how the individuals presented themselves when providing the information." Pederson's App. at 36. It found that Pederson and Fisher "did not present themselves to the Commission staff as joint whistleblowers." *Id.* The Commission noted that Fisher attended the October 2015 meeting alone, Fisher responded to the subpoena alone, and Fisher and Pederson never informed staff that they were acting jointly. In making this determination, the Commission credited Bromberg's supplemental declaration that said enforcement staff did not think that Fisher and Pederson were submitting information as a team.

On appeal, Pederson agrees that we "should decide based on the evidence of how Fisher and Pederson presented themselves at the time the information was provided." Pederson's Br. at 26. But he contends that he and Fisher presented themselves as joint whistleblowers and argues that the Commission should not have relied on Bromberg's declaration. The Commission argues that substantial evidence supports its determination.

The Act says that the Commission "shall pay an award or awards to [one] or more whistleblowers who" meet the criteria. 15 U.S.C. § 78u-6(b)(1). It defines "whistleblower" as "any individual who provides, or [two] or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission." *Id.* § 78u-6(a)(6). "Although the statute does not define 'jointly,' the ordinary meaning of the term is 'in common; together.'" *Johnston v. SEC*, 49 F.4th 569, 576 (D.C. Cir. 2022) (alteration omitted) (quoting *Jointly*, American Heritage Dictionary (2022)). "[T]he question [is] whether, as a matter of fact, [Pederson and Fisher] acted jointly when they provided information to the

[Commission]." *Id.* at 578. Pederson "raises [only] factual dispute[s]" with the Commission's determination that he and Fisher did not present themselves as joint whistleblowers, so "we review the Commission's findings of fact to determine only whether they are supported by substantial evidence." *Id.*

The Commission's determination that Fisher and Pederson were not acting jointly when providing information is supported by substantial evidence. Fisher attended the October 2015 meeting alone, and the Commission was clear that the helpful information that Fisher provided pertained to his own personal experiences as an executive at Biozone. Further, the Commission only subpoenaed Fisher, and only Fisher responded with helpful information. Fisher's counsel, in responding to the subpoena, said "that he represented Fisher and was producing documents in response to the subpoena on behalf of Fisher." Pederson's App. at 41. In *Johnston*, the D.C. Circuit found that the Commission's determination that two claimants were joint whistleblowers was supported by substantial evidence. 49 F.4th at 578. There, the Commission noted that the claimants attended a meeting together in which they provided information, the claimants were represented before the Commission jointly by one attorney, and one claimant's award application said that the information was discovered by a team. *Id.*

This case contrasts starkly with *Johnston*. Pederson and Fisher provided no information jointly. Fisher and his attorney provided all helpful information on Fisher's behalf, not Pederson's. The only information that Pederson provided in connection with the October 2015 meeting was copies of Fisher's litigation documents. But Bromberg said that she understood that Pederson received those documents from Fisher—which is consistent with the repeated, incorrect references to Pederson as Fisher's attorney. Regardless, the information that Pederson provided in his emails was not helpful to enforcement staff. Pederson acknowledged that "the documents Pederson provided to the [Commission] in relation to Fisher's meeting were initially submitted as Pederson's own tip in 2014." Pederson's Br. at 32. As explained *infra* Section II.A.2, the information in Pederson's 2014 tip was not helpful because it was publicly available. Further, Pederson's argument that his

emails were the only written information provided is belied by the record. The Commission's final order makes clear that Fisher orally provided helpful information at the October 2015 meeting and then provided helpful documents in response to the subpoena. Pederson was not involved in the transmission of helpful information at either point.

Pederson contends that the Commission erred because of the email evidence supporting his argument. But on substantial evidence review, "we may not reverse merely because substantial evidence may also support an opposite conclusion." *Bussen Quarries, Inc.*, 895 F.3d at 1045 (cleaned up). First, the Commission addressed Pederson and Fisher's emails discussing an agreement to split an award. But it found that the record evidence weighed against joint whistleblower status because the agreement was not finalized and Fisher provided the helpful information on his own. Second, Fisher told Bromberg before the October 2015 meeting, "We have a lot of information to [provide] the [Commission]." Pederson's App. at 155. But the rest of the email supports the Commission's conclusion: Fisher encouraged Bromberg to talk with Pederson because Pederson would "likely be willing to provide the [Commission] important information." *Id.* Thus, the use of "we" did not necessarily mean that they would present the information together but rather reflected Fisher's understanding that both had information to give. And again, Fisher gave the Commission the helpful information on his own. Regardless, "we may not substitute our judgment of the facts for the Commission's." *Meisel*, 97 F.4th at 762. There is substantial evidence in this record to support the Commission's determination that Fisher provided his information individually, not jointly with Pederson.

### 2. *Pederson's Individual Tips*

The Commission also rejected Pederson's application based on his individual tips in 2013 and 2014. It found that Pederson "did not individually provide original information that led to the success of the Covered Action" because his information was not "new, useful," or "helpful." Pederson's App. at 37. Bromberg stated in her

initial declaration that Pederson's "information and analysis were not helpful . . . because it was already known to staff." *Id.* at 22.

On appeal, Pederson contends that the Commission erred because the information that he provided was eventually used in the enforcement action. His argument misses the point. Pederson and the Commission acknowledge that Pederson's initial tips identified the existence of a pump-and-dump scheme and some of the individuals involved. But Pederson's tips were, nonetheless, not helpful because the Commission already had that information.

The record supports the Commission's conclusion. It received tips from Fisher and others about this scheme prior to Pederson's first tip. Further, Pederson acknowledged that his tips included "very little independent knowledge . . . not derived from publicly available sources" and "comprise[d] [of] primarily independent analysis . . . supported by publicly available information." Pederson's App. at 53. For example, Pederson's first tip discussed Fisher's public litigation against the fraudsters. Pederson argues that his independent analysis should make him eligible for an award. Bromberg, however, said in her initial declaration that "[e]nforcement staff performed its own analysis separate from any information provided by Pederson." *Id.* at 22. Thus, the Commission did not act based on Pederson's submission. Bromberg's "declarations—which were both credited by and relied upon by the Commission—provide more than a scintilla of evidence that the Commission did not use the information provided by [Pederson] in the Covered Action." *See Meisel*, 97 F.4th at 762 (internal quotation marks omitted) (finding substantial evidence to support the determination that Meisel's information did not contribute to the enforcement action because a Commission attorney said in initial and supplemental declarations that the staff already knew the information that he provided before Meisel submitted his tip).

Pederson also argues that he should be eligible for an award because he provided information to the NDCA. The whistleblower regulations say that "the Commission will consider [a claimant] to be an original source of the same

information that [it] obtain[s] from another source if the information satisfies the definition of original information and the other source obtained the information from [the claimant] or [his] representative." 17 C.F.R. § 240.21F-4(b)(5). Pederson contends that he is thus eligible for an award because he gave information to the NDCA and because Bromberg acknowledged that enforcement staff "connected with" and "exchange[d] . . . information" with the NDCA. Pederson's App. at 17. The information that Pederson shared with the NDCA does not entitle him to an award. The rule requires that "the information satisf[y] the definition of original information." 17 C.F.R. § 240.21F-4(b)(5). In his email to the NDCA, Pederson explicitly said that he provided "no new factual information in the complaint that ha[d] not previously been provided to law enforcement authorities." Pederson's App. at 117. Instead, he emailed NDCA because the "filing of the complaint may change the dynamic of FrostZone in the civil litigation context and perhaps in other contexts as well." *Id.* We conclude that Pederson did not provide original information to the NDCA.

### 3. *Due Process*

Pederson argues that the Commission violated his Fifth Amendment right to due process. He avers that the Commission was biased against him because he criticized it for not investigating his initial tips. He also argues that the Commission should not have required him to testify twice about his relationship with Fisher if it would nonetheless rely on Bromberg's declaration.

The Fifth Amendment says that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "For plaintiffs to establish unconstitutional deprivations of property under the Fifth Amendment, they must show that they (1) have protected property interests at stake and (2) were deprived of such property interests without due process of law." *In re Morgan*, 573 F.3d 615, 623 (8th Cir. 2009). "[I]f [Pederson] lacks a constitutionally protected property interest in [his whistleblower award], he cannot establish a due process violation." *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011).

Pederson argues that he has a protected property interest because "[t]hose who invest years of effort and risk their careers to investigate violations or disclose valuable information enter into a contract with the government in response to the statutory offer outlines in Section 922 of the Dodd Frank Act." Pederson's Br. at 40–41. Pederson provides one paragraph of argument on this point. He does not cite a single case nor provide any standards for determining when a party has a constitutionally protected property interest. He asserts no authority to support his argument that all whistleblowers enter into a contract with the Commission. He only broadly cites the Act. We therefore reject Pederson's due process argument because he failed to provide meaningful argument on this required element. *See Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 674 (8th Cir. 2012) (finding an argument was "waived" because the appellant "fail[ed] to provide a meaningful explanation of the argument and citation to relevant authority in their opening brief").

### 4. *Fisher's Award*

Pederson challenges Fisher's award for the first time on appeal. He contends that Fisher was not eligible for an award because, in his 2013 settlement with Biozone and Honig, Fisher "agreed to withdraw his whistleblower complaints with the [Commission] and FBI and refrain from making the same allegations against Honig and others." Pederson's Br. at 49. Thus, Pederson argues that the Commission erred in granting Fisher an award because it "must adhere to fundamental legal principles" and show "respect for settlement agreements." *Id.* at 51.

The Commission argues that Pederson forfeited this argument because he did not raise the issue below. The Securities Exchange Act says that "[n]o objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). Pederson argues that he "could not raise this issue earlier because he lacked information about Fisher's award-winning submission." Pederson's Reply Br. at 23. Thus, he argues that he had a reasonable ground for failing to raise the issue below.

We agree that Pederson forfeited this argument because he did not raise the issue before the Commission. His argument that he could not raise the issue below is contrary to the record. In his request for reconsideration, Pederson acknowledged that the Commission granted Fisher's application based on the "new valuable information . . . offered to the [Commission] during Mr. Fisher's [October 2015] meeting." Pederson's App. at 188 (cleaned up). Pederson therefore did have information about Fisher's award-winning submission, and this basis did not change between the preliminary determination and the final order. Further, in his request for reconsideration, Pederson discussed Fisher's settlement that led Fisher to "[w]ithdr[a]w his complaints to the [Commission]." *Id.* at 186. Pederson therefore had all the information that he needed to raise the issue below but did not. "Congress has prohibited us from considering issues not raised before the [Commission]." *Springsteen-Abbott v. SEC*, 989 F.3d 4, 7 (D.C. Cir. 2021). Pederson forfeited his ability to challenge Fisher's award on appeal.

### 5. *Motion to Compel*

Pederson also filed a motion to compel in this court, which we ordered would be taken with the case. In his motion, Pederson argues that the Commission's administrative record failed to comply with both the Federal Rules of Appellate Procedure and the securities regulations. We disagree and deny the motion.

In filing the administrative record, the Commission filed a certified list that included "the documents and other materials . . . on which the Commission's order denied the whistleblower award claims." A.R. 1. This certified list is authorized by Federal Rule of Appellate Procedure 17, which allows the Commission to file "a certified list adequately describing all documents, transcripts of testimony, exhibits, and other material constituting the record." Fed. R. App. P. 17(b)(1)(B). Contrary to Pederson's argument, the certified list included detailed descriptions of each document. This list also satisfied the Commission's regulations which say that "[t]he record on appeal shall consist of the Final Order, any materials that were considered by the Commission in issuing the Final Order, and any materials that were part of

the claims process leading from the Notice of Covered Action to the Final Order." 17 C.F.R. § 240.21F-13(b). Because the Commission provided all "documents and other materials" that the Commission relied on in "den[ying] the whistleblower claims," A.R. 1, the Commission satisfied its regulatory obligation.

To the extent that Pederson argued in his motion to compel that he did not have access to some of the documents listed, that argument is not supported by the record. In opposition to Pederson's motion to compel, the Commission filed an exhibit showing that when Pederson told the Commission that he did not have access to some documents in the record, the Commission emailed all such documents to Pederson. The motion to compel is denied.

## B. *Amster and Heath*

The Commission denied Amster and Heath's joint whistleblower application because they "did not provide information that caused the Covered Action investigation to open." Amster and Heath's App. at 382. The Commission credited Bromberg's initial and supplemental declarations that said, "[S]taff responsible for the Covered Action were not involved in [their] meetings with Home Office staff in October or November 2013, and did not receive any of [their] information." *Id.* Thus, it found that Amster and Heath "did not submit information that led to the success of the Covered Action." *Id.* at 382–83 (internal quotation marks omitted).

On appeal, Amster and Heath argue that the Commission erred in denying their application because (1) the whistleblower regulations create an objective causation standard, so the actual use of the information is not required for the information to lead to a successful enforcement action, and (2) even if actual use is required, their information still led to the successful enforcement action.

### 1. *Rule Interpretation*

The Act says that the Commission "shall pay an award or awards to [one] or more whistleblowers who voluntarily provided original information to the Commission that *led to the successful enforcement* of the covered judicial or

-18-

administrative action." 15 U.S.C. § 78u-6(b)(1) (emphasis added). Congress granted the Commission "the authority to issue such rules and regulations as may be necessary or appropriate to implement the provisions" of the Act. *Id.* § 78u-6(j). Pursuant to that authority, the Commission promulgated a rule to define what it means for information to "lead[] to successful enforcement." 17 C.F.R. § 240.21F-4(c). That rule defined three circumstances in which "[t]he Commission will consider that [a claimant] provided original information that led to the successful enforcement." *Id.*; *see also Doe v. SEC*, 28 F.4th 1306, 1313 (D.C. Cir. 2022) (per curiam) (holding that the three causation "fact patterns" in 17 C.F.R. § 240.21F-4 are exhaustive, so whistleblower petitioners must meet one of them to show that their information led to a successful enforcement action).

Amster and Heath argue that they are entitled to an award because they attended two meetings at the Commission's D.C. office in late 2013 in which they "presented five case studies of recent suspect pump-and-dump schemes" and identified people involved in these schemes, including Honig and other defendants in the Honig action. Amster and Heath's Br. at 5–6. Because Bromberg stated that the investigation was opened in February 2015, almost two years after their meetings, and because Amster and Heath reported the information to the Commission, only the first causation fact pattern applies here.

Information provided prior to Commission action "leads to successful enforcement" if the whistleblower

> gave the Commission original information that was sufficiently specific, credible, and timely to cause the staff to commence an examination, open an investigation, reopen an investigation that the Commission had closed, or to inquire concerning different conduct as part of a current examination or investigation, and the Commission brought a successful judicial or administrative action based in whole or in part on conduct that was the subject of your original information . . . .

-19-

17 C.F.R. § 240.21F-4(c)(1). Amster and Heath contend that the language "sufficiently specific, credible, and timely to cause the staff to [act]" creates an objective standard. Amster and Heath's Br. at 18 (internal quotation marks omitted). They therefore argue that they are entitled to an award because their information "was sufficiently specific, credible, and timely such that the [Commission] should have opened or expanded an investigation based on it." *Id.* at 23 (internal quotation marks omitted).

The Commission counters Amster and Heath's argument by asserting that they forfeited this argument because they failed to raise it before the Commission. As explained *supra*, "[n]o objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). Amster and Heath contend that they did raise this issue below. But even if they did not, they urge us to nonetheless address their argument because they had reasonable ground for their failure to do so or because the argument is purely legal.

The Commission is correct that Amster and Heath failed to raise this issue below and cannot show reasonable ground for their failure to do so. In their request for reconsideration, Amster and Heath argued that "even if [Commission] staff members do not 'use' a whistleblower's original information within a particular investigation, [the regulations] may nevertheless entitle that whistleblower to an award if the information leads to a successful enforcement action in other ways." Amster and Heath's App. at 286 (alteration and internal quotation marks omitted). Amster and Heath argue that this is sufficient to find that they raised their objective-standard argument below. But in their request, Amster and Heath did not argue that their information could "lead to" successful enforcement under an objective standard—they never used the word "objective" nor argued that their information was "sufficiently specific, credible, and timely," both arguments that they raise now. Instead, they argued that their information could lead to the successful enforcement in other ways because "the decision to open this investigation was based in part on

past investigations of microcap fraud." *Id.* at 287. "If [their] disclosures had led to one such investigation, then . . . their original information *did* help cause the [Commission] to open this investigation." *Id.* This argument mirrors the argument they make now in Part II.B.2 and demonstrates that they did not raise this issue below. *See Springsteen-Abbott*, 989 F.3d at 8 (finding that a petitioner failed to raise a due process argument below despite the petitioner's argument that she made "many pleas for constitutional adjudication" before the Commission because that was "insufficient[:] the Petitioner must raise the *substance* of her argument below" (internal quotation marks omitted)).

Amster and Heath argue that even if they did not raise the issue below, forfeiture should not apply because the Commission "overhauled the record" between the preliminary determination and the final order. Amster and Heath's Reply Br. at 6. They point to *Barr v. SEC*, 114 F.4th 441 (5th Cir. 2024), *petition for cert. filed* (U.S. June 4, 2025) (No. 24-1233). There, the Fifth Circuit held that a petitioner did not forfeit an argument not raised to the Commission. *Id.* at 448. The Commission preliminarily denied the application because the petitioner's information "did not lead to the successful enforcement," but in the final order, it denied his application because the case was not a "covered judicial or administrative action." *Id.* (internal quotation marks omitted). The Fifth Circuit thus allowed the petitioner to raise a new argument because "a miscarriage of justice would result if [it] did not consider th[e] purely legal argument since Barr was unaware of the [Commission]'s legal position and had no opportunity to challenge it in the agency proceedings." *Id.*

This case is not like *Barr*. Amster and Heath's contention that their omission should be excused because the Commission overhauled the record is not supported by the record. The Claims Review Staff preliminarily denied their application because enforcement staff did not use Amster and Heath's information. In their request for reconsideration, they argued that even if enforcement staff did not use their information, they could still satisfy the causation standard because their information could have been used in earlier investigations that eventually led to the

enforcement action. In the final order, the Commission reiterated that the enforcement action was initiated in February 2015 based on an Exams referral and clarified that the Exams referral was also not initiated because of their information. Now, Amster and Heath assert an interpretation argument to claim that even if staff did not use their information, they could still satisfy the regulations. They could have made that argument below and simply did not. Unlike *Barr*, in which the Commission changed legal positions between the preliminary decision and final order, it is Amster and Heath who now seek to change positions.

Amster and Heath contend that we should nonetheless consider the issue because it is a purely legal one. *See Robinson v. Norling*, 25 F.4th 1061, 1063 (8th Cir. 2022) ("[W]e excuse forfeiture in certain limited, well-defined circumstances . . . . One is when the proper resolution is beyond any doubt, and the other is for purely legal issues that do not require additional evidence or argument." (cleaned up)). Even if Amster and Heath are correct that forfeiture does not apply here, we are not persuaded that the rule creates the objective standard that they argue applies.

The rule says that "[i]nformation . . . leads to successful enforcement" if the whistleblower gives "the Commission original information that was sufficiently specific, credible, and timely to cause the staff to [act]." 17 C.F.R. § 240.21F-4(c)(1). Amster and Heath contend that the "sufficient[] . . . to cause" language creates "an objective question, not a subjective one." Amster and Heath's Br. at 17 (alteration in original) (quoting 17 C.F.R. § 240.21F-4(c)(1)). For support, they point to cases in which we applied objective tests and held that the evidence was sufficient for a certain result. But these tests did not themselves include "sufficient to" language and instead featured other hallmarks of an objective test, like a "reasonably prudent person" standard. *See Walker v. Barrett*, 650 F.3d 1198, 1205 (8th Cir. 2011) (finding that conduct "was sufficient to place a reasonably prudent person on notice of a potentially actionable injury at the time the abuse occurred").[2]

---

[2] *See also United States v. Brown*, 217 F.3d 605, 607 (8th Cir. 2000) (stating that "a police officer's intent [in the arrest] is irrelevant as long as there is sufficient objective evidence establishing probable cause for the arrest" (internal quotation

We are not persuaded that the "sufficiently specific, credible, and timely to cause" language creates the argued-for objective test. *See Standard*, Black's Law Dictionary (12th ed. 2024) (defining an "objective standard" as one "based on conduct and perceptions external to a particular person," such as the "the reasonable-person standard" from "tort law"). The Eleventh Circuit rejected this interpretation in *Granzoti v. SEC*, No. 22-13332, 2023 WL 5193503, at *3 (11th Cir. Aug. 14, 2023) (unpublished per curiam). Our sister circuit found "no authority suggesting that this regulation calls for an objective test." *Id.* It emphasized that "[t]o cause" means "[t]o bring about or effect." *Id.* (second alteration in original) (quoting *Cause*, Black's Law Dictionary (11th ed. 2019)). "Naturally, then, something that is never considered by the [Commission] could not have caused the [Commission] to investigate. If the [Commission] didn't consider the information, then the information could not bring about or effect a result." *Id.* It further found that the objective "interpretation adds words to the text, equating the meaning of 'to cause' with 'to have caused' in the process." *Id.*

The Eleventh Circuit's logic is sound and persuasive. The language of the Act itself requires that the whistleblower "provide[] original information . . . that led to the successful enforcement." 15 U.S.C. § 78u-6(b)(1). The Commission's regulation asks whether the information "was sufficiently specific, credible, and timely to cause the staff to [act]." 17 C.F.R. § 240.21F-4(c)(1). We therefore agree that the regulation requires that the Commission actually use the information for the information to cause Commission action. "If the [Commission] didn't consider the information, then the information could not bring about or effect a result." *Granzoti*, 2023 WL 5193503, at *3.

---

marks omitted)); *United States v. Stokes*, 62 F.4th 1104, 1107 (8th Cir. 2023) (finding that the "facts were sufficient to provide [a police officer] with reasonable suspicion to conduct a *Terry* stop").

## 2. *Application of the Rule*

Amster and Heath argue that even if actual use of their information is required, the Commission still erred in denying their application. They contend that even if enforcement staff did not use their information in the Honig investigation, their information still led to the successful enforcement action because "if [their] information contributed to any . . . previous microcap investigations, then they helped launch the investigation that ultimately resulted in the [Commission]'s successful enforcement action." Amster and Heath's Br. at 25–26. They argue that "[a]ll the inferences here are that Amster and Heath's information did help launch at least one of those prior investigations." *Id.* at 26. We review the Commission's determination that Amster and Heath's information did not lead to the successful enforcement action for substantial evidence. *See Meisel*, 97 F.4th at 761.

We conclude that there is substantial evidence supporting the Commission's determination that Amster and Heath's information did not lead to the successful enforcement action. In the final order, the Commission directly addressed and rejected this argument. It said that the "investigation was opened in February 2015 based on an Exams referral, and not because of information provided by [Amster] and [Heath]. Nor was the Exams referral based on [their] information." Amster and Heath's App. at 382. It disagreed that Amster and Heath's information could have been used in past microcap investigations that somehow led to the Exams referral and credited Bromberg's supplemental declaration that said "the Honig Investigation was opened based on an Exams referral, and not based on another past investigation." *Id.* at 373. The record supports this conclusion. Amster and Heath's presentation—given over a year after Fisher's initial tips—identified several potential pump-and-dump schemes that included, but was not limited to, several defendants in the eventual enforcement action. But Bromberg said that "Exams staff identified Honig and Brauser during the course of their examination on their own." *Id.* Bromberg's sworn declarations—which the Commission credited—"amount to substantial evidence supporting the Commission's decision." *Doe v. SEC*, 729 F. App'x 1, *4 (D.C. Cir. 2018) (unpublished); *see also Meisel*, 97 F.4th at 762. We therefore deny their petition.

-24-

### III. *Conclusion*

For the foregoing reasons, we deny both petitions for review and Pederson's motion to compel.

_____